**UNITED STATES of America ex rel. W. Gordon DICK and John P. Daly, Jr., Plaintiffs–Appellants, Cross–Appellees,**

v.

**LONG ISLAND LIGHTING CO., Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis, and Andrew W. Wofford, Defendants–Appellees, Cross–Appellants.**

**Nos. 411, 438, Dockets 89–7497, 89–7519.**

United States Court of Appeals, Second Circuit.

Argued Nov. 1, 1989.

Decided Aug. 14, 1990.

**14**

James D. Harmon, Jr. (Steven J. Ahmuty, Jr., Michael J. Eng, Aaron F. Fishbein, Bower & Gardner, New York City, of counsel), for plaintiffs-appellants.

Susan E. Silverman, Asst. Gen. Counsel, Hicksville, N.Y., for defendant-appellee Long Island Lighting Co.

Michael Lesch, New York City (John G. Nicolich, David S. Tannenbaum, Barry V. Sautman, Shea & Gould, New York City, of counsel), for defendants-appellees Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis and Andrew W. Wofford.

Before VAN GRAAFEILAND, CARDAMONE, and PIERCE, Circuit Judges.

PIERCE, Senior Circuit Judge:

Herein, we examine the jurisdictional requirements of 31 U.S.C. § 3730(e)(4) of the False Claims Act. We hold that the *qui tam* plaintiffs, W. Gordon Dick and John P. Daly, Jr., appellants, did not satisfy the statute's jurisdictional requirements. Accordingly, we conclude that this suit was properly dismissed by the district court.

**I.**

This case arises out of the events discussed at length in *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295 (2d Cir.1990). Familiarity with these events is assumed. We discuss herein only those additional aspects we believe to be necessary to an understanding of the issue presented on appeal.

From approximately 1979 to 1984, appellants W. Gordon Dick and John P. Daly, Jr., as employees of Stone & Webster Engineering Corp., worked as mid-level managers at the Shoreham Nuclear Power Station. By virtue of their positions, they were aware of the construction status of Shoreham. On July 1, 1988, they filed a complaint against the Long Island Lighting Co. ("LILCO"), certain of its executives (collectively, the "LILCO defendants"), and Stone & Webster Engineering Corp. under the False Claims Act, 31 U.S.C. § 3729 *et seq.* (1988), on behalf of the United States. The basic theory of their *qui tam* suit was that LILCO had lied to the state's Public Service Commission about the construction status of Shoreham, thereby obtaining higher rates and defrauding the United States as a ratepayer.

Almost sixteen months earlier, on March 3, 1987, the County of Suffolk ("Suffolk") had commenced a putative class action against the LILCO defendants, alleging in its complaint violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (1988) ("RICO") leading to the rate overcharges. *See County of Suffolk*, 907 F.2d at 1300 (discussing RICO allegations). This action by Suffolk was widely reported in the news media, especially in the Counties of Nassau and Suffolk. Although the appellants' later-filed complaint included some factual assertions not included in Suffolk's complaint against the LILCO defendants, taken as a whole, the *qui tam* complaint was fairly characterized by the district judge as a copy of Suffolk's earlier complaint. *United States ex rel. Dick v. Long Island*

*Lighting Co.,* 710 F.Supp. 1485, 1486 (E.D. N.Y.1989). The following comparison between a portion of Suffolk's original RICO complaint, filed March 3, 1987, and a portion of appellants' original complaint, filed July 1, 1988, illustrates appellants' dependence upon publicly known information. Material common to both complaints is unitalicized and unbracketed; material added by appellants is italicized; material deleted by appellants is bracketed:

> From approximately 1974 to the present, the defendants, with others, have *knowingly*, willfully and purposely engaged in a concerted pattern of fraudulent acts by misrepresenting to, and concealing material facts from, the *United States Government*, ratepayers, *the Public Service Commission of the State of New York*, and others, *and conspiring to do so*, with respect, but not limited, to: (1) the projected completion dates of Shoreham and Jamesport; (2) the projected construction and financing costs of Shoreham; (3) the necessity for Shoreham and Jamesport to meet Long Island's energy requirements; and (4) the construction, licensing, and other problems with Shoreham. The purpose of the defendants' fraudulent activity was: (1) to obtain money from the *United States Government and other* ratepayers to pay for a substantial portion of the costs of Shoreham and Jamesport prior to the commencement of their operation; (2) to conceal construction and other problems at Shoreham so that the project would not be restricted, *deferred* or terminated; (3) to finance Shoreham through both stock and bond offerings, which would have been more costly to LILCO, if not impossible, were it not for the receipt of funds from the *United States Government and from other* ratepayers; and (4) to cover-up defendants' prior fraudulent activity. Defendants' campaign of misrepresentation and fraudulent concealments was largely carried out in the media, through false advertisements and direct publicity mailings to [the] ratepayers, and in false oral and written testimony, and statements made to the *United States Government, to other* ratepayers,

their representative organizations and others in the course of proceedings before the Public Service Commission [of the State of New York] ("PSC") and other public forums. As a result thereof, *the PSC approved* [LILCO obtained approval for] the continued spending on, and financing of, construction of Shoreham. The enormous cost of Shoreham and preliminary cost of Jamesport, were charged substantially to the *United States Government and other* ratepayers.

Numerous examples of nearly identical passages appear throughout the two complaints.

It clearly appears that Suffolk's original RICO complaint was based on information derived from Suffolk's independent investigation of possible wrongdoing by LILCO and not upon information provided by Dick or Daly. Appellants concede that they "came forward [to Suffolk] *after* the original RICO complaint had been filed." (Emphasis added). Dick testified at his deposition that he became aware of Suffolk's RICO action from a newspaper article in *The New York Times* or *The Wall Street Journal*. Further, although the appellants provided some information to Suffolk after Suffolk's March 3, 1987 filing, which Suffolk incorporated into its amended RICO complaint, the information given to Suffolk by the appellants did not cause Suffolk to expand upon the fraud allegations of its original complaint; both Suffolk's original and amended RICO complaint assert the same theory of liability and seek identical amounts of damages.

Pursuant to 31 U.S.C. § 3730(b)(2), appellants' complaint remained under seal for sixty days after it was filed on July 1, 1988. At the end of the sixty-day period, the United States filed a Notice of Declination of Appearance, 31 U.S.C. § 3730(b)(4)(B), and, subsequently, on September 2, 1988, the complaint was unsealed. That same day, appellants filed an amended complaint; the sole change was to delete Stone & Webster Engineering Corp. as a defendant. On April 14, 1989, the district court dismissed with prejudice appellants' *qui tam*

complaint on the ground of lack of jurisdiction.

## II.

■ The False Claims Act (the "Act"), 31 U.S.C. § 3729 *et seq.*, as amended in 1986, empowers the United States, or private citizens on behalf of the United States, to recover treble damages from those who knowingly make false claims for money or property upon the United States, or cause to be made, or who submit false information in support of such claims. Our focus here is upon those *qui tam* provisions of the Act, which, under certain conditions, allow a private citizen to bring a False Claims Act suit on behalf of the federal government. More specifically, we address whether appellants' suit is barred by § 3730(e)(4) of the Act, which provides as follows:

**(e) Certain actions barred.—**

. . . .

**(4)(A)** No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

**(B)** For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

Section 3730(e)(4) does not operate to bar a *qui tam* action unless the action is based upon publicly disclosed "allegations or transactions." In this case, there is no dispute that appellants' suit is based upon publicly disclosed "allegations or transactions." Appellants assert, however, that since they were "original sources," their

suit may be maintained notwithstanding the fact that it is based upon publicly disclosed allegations. Based upon our review of the evidence presented and our interpretation of the applicable statute, we do not agree.

In assessing the pertinent language of the statute, we note that "original source" is expressly defined in § 3730(e)(4)(B). A straightforward reading of § 3730(e)(4)(B) indicates that to be an "original source" a *qui tam* plaintiff must (1) have direct and independent knowledge of the information on which the allegations are based, and (2) have voluntarily provided such information to the government prior to filing suit. A close textual analysis combined with a review of the legislative history convinces us that under § 3730(e)(4)(A) there is an additional requirement that a *qui tam* plaintiff must meet in order to be considered an "original source," namely, a plaintiff also must have directly or indirectly been a source to the entity that publicly disclosed the allegations on which a suit is based.

Focusing upon the word "information" in relation to the term "original source," various facts cumulatively suggest to us that the word "information" is not intended to mean the same in § 3730(e)(4)(A) as it does in § 3730(e)(4)(B). First, if the word "information" means the same in ¶ (4)(A) as it does in ¶ (4)(B), then its use in ¶ (4)(A) would be superfluous since ¶ (4)(A) could simply conclude with the words "original source." The rule of construction that effect must be given, "if possible, to every clause and word of a statute," *Montclair v. Ramsdell*, 107 U.S. 147, 152, 2 S.Ct. 391, 395, 27 L.Ed. 431 (1883), counsels against such an interpretation.

Second, although identical words used more than once in the same section of an act are normally presumed to have the same meaning, we think the statute's construction suggests the propriety of ascribing different meanings to the word "information" as used in ¶ (4)(A) and as used in ¶ (4)(B). The reference to "information" in ¶ (4)(A) is without modification. As used in ¶ (4)(B), however, the word "information" is modified by the words "on which the alle-

gations are based." This suggests a change from prior use, since ordinarily if "information" was intended to mean the same in ¶ (4)(A) as in ¶ (4)(B), the modifying words also would have accompanied the word's initial use. If the modification was expected to apply only to ¶ (4)(B), on the other hand, the exclusive placement of the modification in ¶ (4)(B) is entirely logical. *Cf. United States v. Nunez*, 573 F.2d 769, 771 (2d Cir.) (identical terms within act construed to have same meaning when each term followed by identical language), *cert. denied*, 436 U.S. 930, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978).

Finally, the most natural reading of ¶ (4)(A) suggests that the "information" there referred to is that which was publicly disclosed. This reading buttresses the view that the word "information" referred to in ¶ (4)(A) does not have the identical meaning as that referred to in ¶ (4)(B), since the most plausible reading of ¶ (4)(B) indicates that the "information" referred to therein is that which supplies the basis for the *qui tam* action itself, which is a slightly more expansive definition. Such a slight difference in meaning assumes importance because it permits the interpretation that ¶ (4)(B) does not contain the exclusive requirements in order for one to be an "original source" and that an additional requirement is to be found in ¶ (4)(A).

Since our fundamental task in interpreting a statute is "to give effect to the intent of Congress," *United States v. American Trucking Ass'ns*, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940), we look to the legislative history for evidence of Congress's intent. Two legislators who appear to have been the most involved with the Act's development and passage spoke at length regarding the meaning of "original source." Representative Berman, a co-drafter of the legislation, stated that a person is an "original source" if, *inter alia,* the person "had some of the information related to the claim which he made available to the government or the news media *in advance of the false claims being publicly disclosed.*" 132 Cong.Rec. H9389 (daily ed. Oct. 7, 1986) (emphasis added). Similarly, Senator Grassley, who intro-

duced the legislation in the Senate, noted that the jurisdictional requirements of § 3730(e)(4) barred a person "who had not been an original source *to the entity that disclosed the allegations*" from bringing a *qui tam* claim based on publicly disclosed information. 132 Cong.Rec. S20536 (daily ed. Aug. 11, 1986) (emphasis added). If ¶ (4)(B) contained the exclusive requirements that a *qui tam* plaintiff must satisfy to be an "original source," these legislators' statements would be somewhat inexplicable. However, their statements make much sense if ¶ (4)(A) contains an additional requirement to be considered an "original source," namely, that to be considered an "original source," one must have been a source to the entity that first publicly disclosed the information on which a suit is based. Given the foregoing, we are constrained to adopt a reading of the statute in accord with those statements.

Congress was not unfamiliar with the meaning attributed to "original source" by Representative Berman and Senator Grassley. The Senate Report to the 1986 amendments noted that in 1943 "[t]he Senate specifically provided that jurisdiction would be barred in *qui tam* suits based on information in the possession of the Government unless the relator was the original source of that information. Without explanation, the resulting conference report dropped the clause regarding original sources of allegations...." S.Rep. 345, 99th Cong., 2d Sess. 12, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266, 5277 [hereinafter Senate Report]. The dropped clause would have required that *qui tam* suits be "based upon information, evidence, or sources not then in the possession of the United States, unless obtained from such person (bringing the suit)...." 89 Cong. Rec. 10,845 (1943). The statements of Senator Grassley and Representative Berman reflect an understanding of "original source" consistent with that alluded to by the Senate in this 1986 report, as they indicate that the 1986 amendments require that a *qui tam* suit be based on information not then publicly disclosed, unless dis-

closed, directly or indirectly, by the person bringing the suit.

We also note that "[t]he purpose of the *qui tam* provisions of the False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward." H.R.Rep. No. 660, 99th Cong., 2d Sess. 22 (1986); *see also* Senate Report at 14, 1986 U.S.Code Cong. & Admin.News 5279 (quoting testimony before Senate Judiciary Committee's Subcommittee on Administrative Practice and Procedure stating that the amended False Claims Act rewards those who "bring ... wrongdoing to light"). Our interpretation is in accord with this purpose and is most likely to bring "wrongdoing to light" since, by barring those who come forward only *after* public disclosure of possible False Claims Act violations from acting as *qui tam* plaintiffs, it discourages persons with relevant information from remaining silent and encourages them to report such information at the earliest possible time. The Senate Report stressed that "changes [were] necessary to halt the so-called 'conspiracy of silence' that has allowed fraud against the government to flourish." *Id.* at 6, 1986 U.S.Code Cong. & Admin.News 5271. By requiring the reporting of information *before* public disclosure, our interpretation provides the optimum encouragement to potential plaintiffs to end the "conspiracy of silence."

■ In sum, for the reasons stated hereinabove, we believe that if the information on which a *qui tam* suit is based is in the public domain, and the *qui tam* plaintiff was not a source of that information, then the suit is barred. *See generally,* Oparil, *The Coming Impact of the Amended False Claims Act,* 22 Akron L.Rev. 525, 548 (1989). Since it has not been demonstrated that Suffolk's original complaint relied upon information disclosed by appellants prior to the filing of that complaint, appellants could not have been found to be an "original source" of the publicly disclosed information on which their suit is based. Accordingly, the jurisdictional bar of § 3730(e)(4) was applicable, and the dis-

trict court acted properly in dismissing their complaint for lack of jurisdiction.

Affirmed.