UNITED STATES of America, Appellee,

ex rel. John DOE, Plaintiff–
Relator–Appellant,

v.

JOHN DOE CORP. and John
Doe, II, Defendants.

No. 792, Docket 91–6239.

United States Court of Appeals,
Second Circuit.

Argued Jan. 29, 1992.

Decided April 3, 1992.

Kenneth G. Rothstein, Woodmere, N.Y. (Schneider, Harris, Harris & Furman, Ira J. Furman, Rod Kovel, of counsel), for plaintiff-relator-appellant.

Judith Rabinowitz, U.S. Dept. of Justice, Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., Andrew J. Maloney, U.S. Atty., E.D.N.Y., Charles S. Kleinberg, Asst. U.S. Atty., E.D.N.Y., Michael F. Hertz, and Polly A. Dammann, of counsel), for appellee.

Before: ALTIMARI, WALKER and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Each year, fraudulent billings by federal government contractors deplete the United States Treasury by millions, if not billions, of dollars. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266, 5268 (*"Senate Report"*) ("The Department of Justice has estimated fraud as draining 1 to 10 percent of the entire Federal budget."). To combat this problem, Congress recently revamped the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729–3733 (1988) ("FCA" or "the Act"), to encourage suits by private citizens who learn of fraud against the government. Because *qui tam* plaintiffs ("relators") are entitled to a portion of the proceeds of successful suits, there is the potential for parasitic lawsuits by those who learn of the fraud through public channels and seek remuneration although they contributed nothing to the exposure of the fraud. To discourage such chicanery, Congress carefully crafted a jurisdictional bar to *qui tam* claims that are based on publicly disclosed information.

We are confronted with a *qui tam* action brought by an attorney who learned of the fraud while representing a client who was being investigated in a defense contract scam. The attorney negotiated use immunity in exchange for his client's sworn testimony, then obtained a waiver of the attorney-client privilege from his client, and instituted a *qui tam* action against his client's employer. Ethical implications aside, we find the relator's complaint is based on publicly disclosed information. Accordingly, we affirm the district court's dismissal.

## BACKGROUND

John Doe Corp.[1] performs services for the military under several defense contracts. In July 1989, an unidentified former employee of John Doe Corp. contacted the Federal Bureau of Investigation about certain fraudulent billing practices of de-

fendant. A team of investigators from different branches of the government—including the FBI, the Air Force Office of Special Investigations ("OSI"), the Defense Criminal Investigative Service ("DCIS"), and the Defense Contract Audit Agency ("DCAA")—was then assembled to investigate the allegations.

OSI's responsibilities include investigating allegations of fraud in Air Force contracts, and, as here, OSI often coordinates its investigations with the Department of Justice. OSI is the sole administrative body within the Air Force authorized to enforce administrative penalties, such as suspension or debarment, against those who engage in defense contract fraud. DCIS's responsibilities include investigating accusations of fraud for the Defense Logistics Agency ("DLA"). While DLA is the agency responsible for enforcing administrative penalties for defense contract fraud, it has no independent investigative arm, and must rely on DCIS and the FBI for those services. The DCAA audits defense contractors to determine whether to levy administrative sanctions.

By early 1990, these investigators had compiled sufficient evidence against John Doe Corp. for the Justice Department to obtain search warrants for the corporation's premises and its bank's vault. On February 15, 1990, at 8:55 a.m., government agents simultaneously executed the two warrants. Twenty-one agents from the FBI, OSI, and DCIS entered defendant's premises wearing raid jackets, sealed the building, and announced that they were executing a search warrant. Present at the time were employees and several customers of John Doe Corp. The investigators served the search warrant on defendant's president and chief executive officer, John Doe II, an individual defendant in this case. As a number of the agents seized approximately 139 boxes of documents and computerized data, others questioned John Doe Corp.'s employees.

---

**1.** The FCA obligates relators to file their complaints under seal, and they remain under seal for sixty days while the government determines whether to intervene and take over the litigation. *See* 31 U.S.C. § 3730(b)(2). Because the briefs in this appeal were also filed under seal, we will not refer to the parties by name.

The investigators explained to the employees that they were investigating allegations that John Doe Corp. was fraudulently overcharging the government under defense contracts. Several, but not all, employees questioned knew of the overcharging by the defendant.

Acting on information from their informant, the government targeted a particular employee, Ed Meyerson, who allegedly controlled the falsified records. When Meyerson refused to cooperate, the investigators served him with a subpoena to appear before a federal grand jury on March 15, 1990.

Prior to his scheduled grand jury appearance, Meyerson retained an attorney, the relator in this action. The relator informed the Assistant United States Attorneys conducting the investigation that Meyerson intended to invoke his Fifth Amendment privilege against self-incrimination before the grand jury. The government then agreed to grant Meyerson use immunity in exchange for his sworn testimony. The government attorneys drafted an immunity letter indicating that Meyerson was not a target of the criminal probe and that if he testified truthfully his testimony would not be used against him. Meyerson and his attorney signed the immunity letter and, on March 23, 1990, Meyerson submitted to a sworn examination before the government attorneys, in lieu of appearing in front of a grand jury. Meyerson admitted that he personally falsified John Doe Corp.'s records in order to overcharge the government on defense contracts. This testimony further corroborated the information provided by the informant.

During Meyerson's testimony, the relator learned that the government had not yet instituted a civil suit under the FCA against defendants. He discussed with his client the possibility of filing a *qui tam* action against defendants and noted the likelihood of a sizeable award should the suit be successful. Meyerson apparently had no interest in pursuing a *qui tam* action, but said he would not object if the

relator, himself, filed such an action. Seizing the moment, the relator says he had Meyerson sign a document waiving any interest he might have in a *qui tam* action. This document, which the relator steadfastly refused to show the government (and therefore is not part of this record), also purportedly waives the attorney-client privilege between the relator and Meyerson.

Armed with this paperwork—which no one has seen—the relator then filed this *qui tam* action on behalf of the United States seeking twenty-one million dollars in damages. The complaint alleges that John Doe Corp. and its president and chief executive officer overcharged the government under various defense contracts. Specifically, the complaint alleges that John Doe Corp. used employees without security clearance on contracts requiring such clearance and padded bills by charging the government for hours not worked.

While the complaint was still under seal, the government moved, as *amicus curiae*, to dismiss for lack of subject matter jurisdiction under the FCA. The FCA provides, in pertinent part:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

Judge Mishler granted the motion to dismiss on two grounds. First, he held that, in spite of the statute's language, Congress meant to bar actions based upon information already possessed by the government when the action was filed.[2] Alternatively, Judge Mishler held that the action was barred by the express language of § 3730(e)(4)(A) of the Act because the allegations in the complaint were based upon

---

**2.** At oral argument, the government conceded that this was a distorted reading of the legisla-

tive history. We agree. *See infra,* at 321–22.

information that had been publicly disclosed.

The relator now appeals.

## DISCUSSION

By allowing *qui tam* relators to share in any recovery, the FCA encourages those with knowledge of fraud against the government to bring that information to the fore. In the past, however, that financial incentive worked against the government's interests in exposing fraud and recouping lost money. As originally enacted, the FCA did not require that relators bring any new information to the government's attention; rather, individuals were able to bring suit based solely on information already uncovered in the government's investigation and, then, share in the award. *See, e.g., United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). *Qui tam* suits by individuals seeking quick cash without assisting in exposing the fraud were aptly characterized by Attorney General Biddle, in 1943, as "parasitic" actions. *See* Oparil, *The Coming Impact of the Amended False Claims Act*, 22 Akron L.Rev. 525, 535 (1989).

*Marcus* represents the high-water mark for parasitic *qui tam* actions. There, the relator's civil complaint appeared to be copied from a criminal indictment. The Supreme Court held that nothing in the FCA barred the relator's action even if his knowledge of the fraud was solely a product of the government's investigation. *Id.* at 545, 63 S.Ct. at 384. Reacting to *Marcus*, Congress immediately amended the *qui tam* provisions of the FCA to bar all *qui tam* actions based on information that the government already possessed. Act of December 23, 1943, 57 Stat. 608, *recodified in* 31 U.S.C. § 3730(b)(4) (1982) (superseded); *see Safir v. Blackwell*, 579 F.2d 742, 745–46 (2d Cir.1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979).

The "government knowledge" standard embodied in the 1943 amendment eventually worked at cross-purposes with the *qui tam* provisions of the FCA. For example, the Seventh Circuit barred a *qui tam* action by the state of Wisconsin because, before filing its *qui tam* action, Wisconsin had conducted a massive investigation and had reported the fraud to the federal government, as it was required to do by law. The Seventh Circuit held that Wisconsin's action was barred because the federal government already possessed the information upon which the complaint was based, notwithstanding that the government had acquired its knowledge only through the obligatory disclosure by Wisconsin. *See United States ex rel. Wisconsin v. Dean*, 729 F.2d 1100, 1102–06 (7th Cir.1984).

*Qui tam* actions under the FCA had gone in forty years from unrestrained profiteering to a flaccid enforcement tool. In 1986, Congress set out to reinvigorate the FCA's *qui tam* provisions. *See generally* Senate Report at 1–17, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266–82. The 1986 amendments attempt to strike a balance between encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud. *See United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1154 (3rd Cir.1991) (the "principal intent" of the 1986 amendments "was to have the *qui tam* suit provision operate somewhere between the almost unrestrained permissiveness represented by the *Marcus* decision, and the restrictiveness of the post–1943 cases....") (citation omitted); Oparil, *supra*, 22 Akron L.Rev. at 549 ("Clearly, the purpose of the [1986] amendment[s] was to retain the 1943 Amendment's bias against parasitic lawsuits.").

As one means of encouraging private citizens to expose fraud, Congress repealed the "government knowledge" jurisdictional bar to *qui tam* actions. *See United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1497–98 (11th Cir.1991); *United States ex rel. LeBlanc v. Raytheon Co.*, 913 F.2d 17, 19 & n. 1 (1st Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991); *Erickson ex rel. United States v. American Inst. of Biological Sciences*, 716 F.Supp. 908, 918 (E.D.Va.

1989). And, to avoid the blatant opportunism embodied in cases like *Marcus*, Congress enacted narrowly circumscribed exceptions to *qui tam* jurisdiction. *See* 31 U.S.C. § 3730(e)(1)–(4); *Stinson*, 944 F.2d at 1154; *see also United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1419–20 (9th Cir.1991).

Here, we must consider whether § 3730(e)(4)(A) bars the relator's claim.[3] Public disclosure of the allegations upon which the *qui tam* complaint rests is the bedrock of § 3730(e)(4)(A)'s jurisdictional bar. We have recently stated that allegations of fraud are publicly disclosed when they are placed in the "public domain." *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir.1990). We must now consider how far into the public domain the allegations must seep before the disclosure may be considered a "public" disclosure.

█ The relator suggests that, for the disclosure to be "public", the information must be potentially accessible to any member of the public. He argues that any member of the public must have a *legal right* to compel disclosure of the information, or, otherwise, it is not public. We do not believe the Act mandates such a broad reading of the phrase "public disclosure".

The Third Circuit has recently examined the concept of public disclosure. *See Stinson*, 944 F.2d at 1157–60. In *Stinson*, the relator, an attorney, had represented a client in an earlier insurance litigation ("the *Leonard* litigation"). During the discovery process in the *Leonard* litigation, the attorney learned that Prudential had been engaged in fraud against the federal government. Armed with these discovery materials, the attorney brought a *qui tam* action against Prudential. The district court dismissed the action as jurisdictionally barred by § 3730(e)(4). *Id.* at 1151–52.

Affirming the district court, the Third Circuit stated that "section 3730(e)(4) [was] designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." *Id.* at 1155–56. The court went on to note that the trial court in the *Leonard* litigation had not issued a protective order limiting the use of the discovery materials, and stated that "[w]e must assume from the absence of a protective order that the information disclosed in discovery is potentially accessible to the public." *Id.* at 1158.

In *Stinson*, there was no suggestion that any member of the public other than the relator had actually seen the documents from the *Leonard* litigation. Yet, the Third Circuit held that, because any diligent member of the public could have gone to court and demanded to see the documents, there was public disclosure. Potential accessibility by those not a party to the fraud was the touchstone of public disclosure. In conclusion, the *Stinson* court stated:

> We have given a practical, commonsense interpretation to "public disclosure," one that distinguishes between information hidden in files or disclosed in private and information produced pursuant to the discovery process which is presumptively, absent a court order, available for filing and general use.

*Id.* at 1161.

Here, in contrast to *Stinson*, the allegations of fraud were not just *potentially* accessible to strangers, they were *actually* divulged to strangers to the fraud, namely the innocent employees of John Doe Corp. While the search warrant was being executed, the investigators spoke to numerous employees of John Doe Corp., some of whom knew of the fraud. But, more importantly, many of these individuals knew nothing about defendants' ongoing scheme;

---

**3.** We note that, even if a relator's claim is based upon allegations or transactions that were publicly disclosed in a manner set forth in § 3730(e)(4)(A), the action is not jurisdictionally barred if the relator is an " 'original source' of the information." 31 U.S.C. § 3730(e)(4)(A).

Because the relator here does not claim to be an "original source", as that term is defined in § 3730(e)(4)(B), we consider only whether his complaint is based upon allegations or transactions that were publicly disclosed in a manner set forth in § 3730(e)(4)(A).

they were strangers to the fraud. These people were neither targets of the investigation nor potential witnesses. The government may have hoped that these individuals were potential witnesses, but it is clear that they were not.

■ When these innocent employees learned of the fraud, they were under no obligation to keep this information confidential. We cannot accept the relator's argument that simply because other members of the public did not have a legal right to pry the allegations of fraud from the mouths of these innocent employees, there was no "public disclosure". Were this Congress' intent, we would expect a narrower exception to jurisdiction, one that bars only those actions based on generally accessible government documents and news media accounts. Section 3730(e)(4)(A) is not so circumscribed.

One reason for the 1986 amendments was to prod the government into action, rather than allowing it to sit on, and possibly suppress, allegations of fraud when inaction might seem to be in the interest of the government. *See Senate Report* at 24–26, *reprinted in* U.S.Code Cong. & Admin.News 5289–91; H.R.Rep. No. 660, 99th Cong., 2d Sess. 22–23 (1986); *United States v. CAC–Ramsay, Inc.,* 744 F.Supp. 1158, 1160 (S.D.Fla.1990); *see also Erickson,* 716 F.Supp. at 917 n. 21 (citing legislative history critical of government's failure to act upon certain allegations of fraud). Once allegations of fraud are revealed to members of the public with no prior knowledge thereof, the government can no longer throw a cloak of secrecy around the allegations; they are irretrievably released into the public domain. The fact that they may not be widely disseminated does not inure to the benefit of a *qui tam* relator. Furthermore, requiring that allegations of fraud be widespread before they are deemed publicly disclosed would cut against the essential purpose of the 1986 amendments, *viz,* that individuals with knowledge of the fraud "report such information at the earliest possible time." *Dick,* 912 F.2d at 18; *see Senate Report* at 6, *reprinted in* U.S.Code Cong. & Admin.News 5271.

■ The relator has gone to great lengths to make clear that none of the government's allegations were ever conveyed to any of defendants' customers. The relator assumes—correctly—that had defendants' customers been advised of the allegations, this would suffice as a public disclosure. There is, however, no principled distinction between defendants' customers and defendants' innocent employees: both are members of the public, yet neither can be compelled to further disseminate the allegations of fraud.

■ Having determined that the allegations of fraud were publicly disclosed, we next consider whether they were disclosed in a manner set forth in the statute. Section 3730(e)(4)(A) furnishes an exclusive list of the ways in which a public disclosure must occur for the jurisdictional bar to apply. *See Williams,* 931 F.2d at 1499. Thus, if the public disclosure does not occur in "a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media", 31 U.S.C. 3730(e)(4)(A), the *qui tam* action is not barred.

The relator argues that any disclosure that took place occurred during the course of a criminal investigation, and, because the statute does not mention criminal *investigations* as a manner in which a public disclosure may occur, the action is not barred. The government, on the other hand, claims that the disclosure occurred in a combined criminal and administrative investigation, and because the administrative investigations are listed in the statute, the action is barred. We agree with the government.

After being tipped off by the informant, the government commenced a multifaceted investigation, which had criminal, civil, and administrative ends. OSI and DCIS are responsible for investigating allegations of fraud in military contracts to determine whether administrative penalties such as suspension and debarment are in order. Additionally, before this *qui tam* suit was

brought, an auditor from the DCAA was assigned to the investigation to conduct an audit of John Doe Corp. for administrative purposes.

The relator seeks to avoid the administrative nature of this investigation by characterizing OSI's and DCIS's involvement as simply an administrative "interest" in the outcome. We are not persuaded. To begin with, we have difficulty discerning the meaning of an administrative "interest". More importantly, it cannot be denied that administrative investigators were probing these allegations with an eye towards a suspension or debarment proceeding. That these investigators were able to work with a team of criminal investigators does not alter the reality that there was an ongoing administrative investigation. It is noteworthy that the criminal investigators agreed to let Meyerson submit to a sworn examination rather than putting him before the grand jury. By following this course, investigators were able to hear Meyerson's testimony, and the information obtained could be shared among the criminal, civil, and administrative investigators without breaching the secrecy of grand jury proceedings. *See* Federal Rules of Criminal Procedure 6(e)(3)(A) & (B).

■ The relator's final argument is that his complaint is not *based upon* allegations or transactions that were publicly disclosed in a manner provided in the statute. He claims that he became aware of the allegations of fraud solely through his representation of Meyerson. The relator's argument misses the point. The allegations in his complaint are the same as those that had been publicly disclosed prior to the filing of the *qui tam* suit. Public disclosure of the allegations divests district courts of jurisdiction over *qui tam* suits, regardless of where the relator obtained his information. *See Dick,* 912 F.2d at 18 ("[I]f the information on which a *qui tam* suit is based is in the public domain, and the *qui tam* plaintiff was not a source of that information, then the suit is barred."); *United States ex rel. LaValley v. First Nat'l Bank of Boston,* 707 F.Supp. 1351, 1367 (D.Mass.1988) (*qui tam* suit not barred because information in complaint was not "information that was contained in *any* public disclosure") (emphasis added). Were it otherwise, parasitic actions would flourish.

## CONCLUSION

The relator's complaint is jurisdictionally barred by the plain language of the FCA.

AFFIRMED.

WALKER, Circuit Judge, dissenting:

The majority finds a public disclosure in the fact that FBI agents interviewing potential witnesses advised "innocent employees" of John Doe Corporation of the fraud. I have two difficulties with this conclusion. First, the factual record does not support the claim that the FBI interviewed "innocent employees" and for that reason this case at least should be remanded for further factual development. Second, even assuming that the FBI did interview "strangers to the fraud", I do not agree that advising individual employees of the targeted organization would necessarily constitute a public disclosure under the statute. I do not think that bringing the fraud to the attention of innocent employees, who have no incentive to make further disclosures to the detriment of their employer, serves the purpose of the *qui tam* statute of preventing the government from sitting on its hands. Finally, I believe that by finding a public disclosure here, the majority is effectively countenancing a return to the "government investigation" standard, which Congress rejected in the 1986 amendments to the False Claims Act. Accordingly, I dissent.

### 1. Were "innocent" employees interviewed?

The majority repeatedly characterizes the people interviewed by the government, upon whom the majority rests its conclusion of public disclosure, as "strangers to the fraud" and "innocent employees." I am not sure how the majority justifies this critical determination. Certainly it is possible that some of the people targeted by the government in fact were unaware of the

fraudulent course of the corporation's business. However, the majority's arrival at this conclusion seems to be based on guesswork and supposition.

The record does not support what the majority suggests is "clear." The only evidence pertaining to the state of mind of those interviewed by the government are two affidavits submitted by an FBI agent. In one affidavit, the agent stated that "[w]e asked the persons we spoke to about their knowledge of these allegations. Some of the people we spoke to provided further information in support of these allegations and some refused to speak with us altogether." In the other, the agent reported that "[s]ome of the employees who were questioned acknowledged that fraud against the United States had been taking place." In neither affidavit did the agent state, or even suggest, that any of the interviewed employees were without knowledge of the pervasive frauds alleged to be occurring at John Doe Corp. It is only by judicial alchemy that the majority can convert this factual record into its conclusion that some of those interviewed were "innocent employees" who knew nothing of the ongoing fraud. At the very least, then, this case should be remanded for further fact finding to determine whether any of the employees interviewed were in fact ignorant of the fraud.

### 2. Would disclosure by the FBI to innocent employees of the company constitute a "public disclosure"?

I agree with the majority that it is not necessary that members of the public have "a legal right to pry the allegations of fraud from the mouths of innocent employees" in order for there to be a public disclosure. However, the majority also states that "once allegations of fraud are revealed to members of the public with no prior knowledge thereof", a public disclosure has occurred. Presumably, "members of the public" could be one or two people with no incentive to further reveal what they have learned. This I cannot accept. As the Third Circuit recognized in *U.S. ex rel. Stinson v. Prudential Ins*, 944 F.2d 1149, 1161 (3rd Cir.1991), the statute demands "a

practical, commonsense interpretation of 'public disclosure,' one that distinguishes between information hidden in files or *disclosed in private* and information ... which is presumptively ... available for ... general use." (emphasis added). The majority departs from *Stinson* by treating matters "disclosed in private" as if they were presumptively available for general use.

Such an expansive reading of "public disclosure" thwarts Congressional intent in amending the *qui tam* provision. The purpose of the 1986 expansion of the False Claims Act was to encourage the discovery of fraud and prevent the government from "sitting" on fraud of which it had knowledge. *See United States v. CAC–Ramsay, Inc.*, 744 F.Supp. 1158, 1160 (S.D.Fla.1990). Thus, in assessing whether or not there has been a public disclosure, courts should be focusing on whether there has been sufficient dissemination such that it is reasonably likely that the fraud will come to light.

This standard might be met where, as in *Stinson*, the information is deposited in a place generally accessible by the public. No such deposit has occurred in this case. Alternatively, there might be a public disclosure where the fraud is privately disclosed to people with an incentive to bring the fraud to public attention. However, I think it unlikely that this standard would be met in the present case, even if we assume that the FBI did interview "innocent" employees.

After all, even innocent employees have compelling reasons not to alert the general public to frauds committed by their employer. The whistleblowers' lot is not a happy one. The innocent employee who comes forward with allegations of fraud by her employer knows that her job may be in jeopardy. Thus, contrary to my colleagues, I think there is a clear distinction between information communicated to employees and to customers. See Majority Opinion at 323. Customers are in a far less precarious position vis-a-vis the defrauding corporation, and thus are far more likely to bring the fraud to light.

Indeed, this very case demonstrates that the sort of disclosure at issue here will rarely bring fraud to light and that it will do precious little to prevent the government from "sitting on its hands." In the two years since the government interviewed the "innocent employees," there is no indication that anyone other than government investigators and employees of the corporation (and the relator) acquired any knowledge either of the identity of John Doe Corporation or of the extent of the fraud. Moreover, during the two years since what the majority considers to be "public disclosure" of the fraud, the government has yet to initiate either a criminal or civil action against John Doe Corporation.

Finally, the rule adopted by the majority, that every disclosure to an ignorant potential witness constitutes a public disclosure, effectively shifts the standard from "public disclosure" back to "government investigation." After all, in virtually every investigation the government will interview some potential witnesses who later may turn out to have had no prior awareness of the misconduct. This cannot be what Congress envisioned by "public disclosure." Congress decisively rejected the "government investigation" standard in the 1986 amendments to the False Claims Act. We should not disturb the balance Congress struck in 1986 between the desire to avoid parasitic claims and the need to bring fraud to light by resurrecting that standard in a different guise.

In sum, I believe the majority is mistaken on two counts. First, the factual record does not support the majority's conclusion that the government interviewed "innocent employees" who were "strangers to the fraud." Second, the legal standard for public disclosure adopted by the majority is contrary to Congressional purpose in expanding the False Claims Act.

I respectfully dissent.