HENRY, Circuit Judge,
dissenting.
I respectfully dissent.
. Qui tam actions have been described by some not generally favorable to them as follows:
The term [“qui tam”] derives from the Latin phrase “qui tam pro domino rege quam pro se imposo sequitur,” meaning “he who brings the action as well for the king as himself.” The original idea was simple: where an entity has defrauded the federal government, a private party should be able to bring suit against the malefactor and share in the government’s recovery.:..
James T. Blanch et al., Citizen Suits and Qui Tam Actions 4 (Roger Clegg & James L.J. Nuzzo eds., 1996).
It is not surprising that qui tam suits would develop nor is it surprising that they may work. A society such as ours surely understands market motivations. When the government — through inattention or because of overtaxed investigative and prosecutorial resources — cannot ■ or does not attempt to recover for fraud, qui tam actions allow private citizens to bring claims on behalf of the government and share in any bounty recovered.
But what the Congress giveth, some of the courts seem to taketh away. The various circuits have adopted different rules covering the four-part test which must be met to provide federal qui tam jurisdiction. The test, as related by the majority, is as follows:
(1) whether the alleged “public disclosure” contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made “public” within the meaning of the False Claims Act; (3) whether the relator’s complaint is “based upon” this “public disclosure”; and, if so, (4) whether the relator qualifies as an “original source” under section 3730(e)(4)(B).
Op. at 1544.
My difference with the majority results-from its application of United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514 (10th Cir.1996), to the facts at hand. Ramseyer takes a practical approach that recognizes Congress’s intent to create a workable system to uncover fraud against *1550 the government. The qui tam provisions of the False Claims Act must both “ ‘encourage private citizens with first-hand knowledge [of fraud] to expose [it]’ ” while at the same time “ ‘avoid civil actions by opportunists attempting to capitalize on public information without seriously contributing to the disclosure of the fraud.’ ” Ramseyer, 90 F.3d at 1519-20 (quoting United States ex rel. Precision Co. v. Koch Indus., 971 F.2d 548, 552 (10th Cir.1992), cert. denied, 507 U.S. 951, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993)). The dual purposes of qui tam noted in Ramseyer, 90 F.3d at 1519-20, and Precision, 971 F.2d at 552, must be balanced against each other. I believe Ramseyer struck the proper balance in the following passage:
As to the second of these purposes, we do not believe that an actual disclosure rule will encourage parasitic lawsuits. Information to which the public has potential access, but which has not actually been released to the public, cannot be the basis of a parasitic lawsuit because the relator must base the qui tam suit on information gathered from his or her own investigation. If a specific report detailing instances of fraud is not affirmatively disclosed, but rather is simply ensconced in an obscure government file, an opportunist qui tam plaintiff first would have to know of the report’s existence in order to request access to it. With regard to such materials, which are at best “only potentially in the public eye, ” we agree with the District of Columbia Circuit that “no rational purpose is served — and no ‘parasitism’ deterred — by preventing a qui tam plaintiff from bringing suit based on their contents.”
Ramseyer, 90 F.3d at 1520 (quoting United States ex rel. Springfield Terminal Ry. v. Quinn, 14 F.3d 645, 653 (D.C.Cir.1994) (emphasis added)).
In striving to reach the proper balance, the majority concludes that the disclosure of the audit report to the state of Oregon amounts to a “public disclosure” under 31 U.S.C. § 3730(e)(4)(A). I believe this result is in error for two reasons: first, I believe Ram-seyer ’s logic suggests that the mere disclosure from a federal agency to a state government may not always amount to a public disclosure; and second, though the state of Oregon was not a party to the contract between the Department of Energy and MK-Ferguson Company, it had prior knowledge of the fraud and was liable for ten percent of the ultimate cost of the fraud, and hence was not, in Ramseyer’s terms, “ ‘a stranger to the fraud.’” See Ramseyer, 90 F.3d at 1520 (quoting United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 322-23 (2d Cir.1992)).
My first point, that the Department of Energy’s providing the audit report to the state of Oregon is not a public disclosure follows directly from Ramseyer: “Only when there is a positive act of disclosure to the public can the government ‘no longer throw a cloak of secrecy’ around the allegations, for at that point the information has been ‘irretrievably released into the public domain.’ ” 90 F.3d at 1520 (quoting John Doe Corp., 960 F.2d at 322). As Ramseyer noted, not requiring a positive act of disclosure would reinstate the pre-1986 jurisdictional bar of qui tam actions “ ‘based on evidence or information the Government had when the action was brought.’ ” Id. (quoting 39 U.S.C. § 3730(b)(4) (1982) (superseded)). “Congress sought to replace this restrictive jurisdictional prerequisite in part because of its concern that the government was not pursuing known instances of fraud.” Id. (quoting United States ex rel. Fine v. MK-Ferguson Co., 861 F.Supp. 1544, 1551 (D.N.M.1994)). Thus, Ramseyer concluded that the mere accessibility to a report in government files by the general public via a Freedom of Information Act request does not constitute a public disclosure for the purposes of federal qui tam jurisdiction.
Merely, providing the state of Oregon with a lengthy audit report is likewise not a public disclosure. In this matter, the state of Oregon has entered into an agreement with the United States government through the Department of Energy to clean up the Lake-view site. Although the audit did not state any restrictions on its dissemination, there is no evidence that the state of Oregon took positive steps to release it to the public nor is there any reason to believe that other corre *1551 spondence between the federal agency and the state government concerning their partnership was actively made public. The mere fact that the state of Oregon has the audit report in a file cabinet somewhere subject to public disclosure under the state “Public Records Act,” see Org.Rev.Stat. § 192.410-.505, does not constitute an affirmative disclosure to the public. These materials are “at best ‘only potentially in the public eye.’ ” See Ramseyer, 90 F.3d at 1520 (quoting Springfield Terminal Ry., 14 F.3d at 653).
Finally, the second point: Ramseyer suggests the disclosure must be to some member of the public with no prior knowledge of the fraud. The majority characterizes Oregon as “a stranger to the fraud.” Op. at 1545 (citing Ramseyer, 90 F.3d at 1520 (quoting John Doe Corp., 960 F.2d at 322-23)). I believe that the facts suggest that the state of Oregon had prior knowledge of the alleged fraud and moreover, is no stranger thereto. Oregon conducted three separate audits of its own after questioning some of the additional costs claimed by MK-Ferguson under its contract with the Department of Energy. It was Oregon’s audits that instigated the Department of Energy investigation resulting in the federal audit report, which the majority holds was “publicly disclosed” through its transfer to the 'state of Oregon. Furthermore, Oregon has entered into a agreement as prescribed by the Uranium Mill Tailings Radiation Control Act, Pub.L. No. 95-604, 92 Stat. 3021 (1978) (codified as amended at 42 U.S.C. §§ 7901-42 (1995)), whereby it is responsible for ten percent of the costs, of remediation at designated cites, including the Lakeview site that MK-Ferguson was hired to cleanup. Although MK-Ferguson’s contract was with the Department of Energy and the state of Oregon was not a party thereto, to the extent MK-Ferguson has defrauded the Department of Energy through false claims under the contract, the state of Oregon is ultimately responsible for ten percent of the additional costs. Thus, to my mind, Oregon had prior knowledge of the fraud and was not a stranger to the effects of the fraud.
Although scholars have challenged the constitutionality of qui tarn actions, that question is not presented in this ease. Though the statute may need to be revised, see Blanch et al., supra, at 5 (noting “that a more straightforward ‘bounty system, without a role for the whistleblower in actually conducting a lawsuit, would address these constitutional concerns [arising from qui tarn suits]”), qui tarn actions now exist as a sometimes effective tool aimed at diminishing fraud against the federal government and its taxpayers. Judicial constructions should not overly limit this Congressionally provided tool. As I believe Ramseyer supports the conclusion that the mere providing of an audit report to a state government, which has instigated the audit, does not constitute a public disclosure, I would allow Mr. Fine’s qui tam suit to proceed.