**UNITED STATES ex rel. Patricia S. MIKES and Patricia S. Mikes, Individually, Plaintiffs,**

v.

**Marc STRAUS, Jeffrey M. Ambinder and Eliot L. Friedman, Defendants.**

No. 92 Civ. 2754 (WCC).

United States District Court, S.D. New York.

June 26, 1996.

Holland Kaufmann & Bartels (Harold R. Burke, of counsel), Greenwich, Connecticut, for Plaintiffs.

Meiselman, Farber, Packman & Eberz, P.C. (Mary Beth Kilgannon, of counsel), Mount Kisco, New York, for Defendants.

**WILLIAM C. CONNER, Senior District Judge:**

Plaintiff Patricia Mikes brings this action on behalf of the United States and herself against her former employers under the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, for alleged improper billing for medical procedures, including magnetic resonance imaging ("MRI") tests. Plaintiff has moved to dismiss defendants' counterclaims and to strike certain affirmative defenses. Defendants have cross-moved for summary judgment dismissing plaintiff's MRI-related claims for lack of

subject matter jurisdiction. For reasons discussed below, plaintiff's motion is granted in part and denied in part, and defendants' motion is denied.

### BACKGROUND

The facts of this case are set forth fully in *United States ex rel. Mikes v. Straus,* 853 F.Supp. 115 (S.D.N.Y.1994) [hereinafter *Mikes I*], and *Mikes v. Strauss,* 889 F.Supp. 746 (S.D.N.Y.1995) [hereinafter *Mikes II*]; we summarize portions that are relevant to the instant motions. In 1992, plaintiff filed suit claiming, *inter alia,* that defendants are liable under the FCA for submitting claims to the United States through the Medicare program for unwarranted and improperly administered spirometry tests, under 31 U.S.C. § 3730(h) and New York Labor Law § 740 for retaliatory discharge, and under New York Labor Law § 191 for unpaid wages for work that she performed after defendants terminated her employment agreement. Defendants moved to dismiss for, among other things, failing to state a claim on which relief could be granted under Fed.R.Civ.P. 12(b)(6), and for failing to meet the heightened pleading requirements for claims based on fraud under Fed.R.Civ.P. 9(b). Judge Broderick granted defendants' motion, but also granted plaintiff leave to amend her complaint to comply with Rule 9(b)'s requirements. *Mikes I,* 853 F.Supp. at 117.

Plaintiff then filed a First Amended Complaint further detailing defendants' fraudulent practices, including allegations that defendants caused to be submitted claims to the United States through the Medicare program for unwarranted MRI tests by referring patients for MRI tests more frequently than medically necessary. That complaint charged defendants with knowingly presenting or causing to be presented false claims to the government in violation of 31 U.S.C. § 3729(a)(1), using false records to facilitate payment of a fraudulent claim in violation of 31 U.S.C. § 3729(a)(2), conspiring to defraud the Government in violation of 31 U.S.C. § 3729(a)(3), discharging plaintiff in retaliation for preparing to file this action in violation of 31 U.S.C. § 3730(h), and failing to pay plaintiff wages for the two-week period

that she worked after her termination in violation of New York Labor Law § 191(3). Defendants again moved to dismiss the action under Rules 12(b)(6) and 9(b) or, in the alternative, to compel arbitration. Converting defendants' motion *sua sponte* into a motion for summary judgment, the court found that the First Amended Complaint and plaintiff's affidavit raised genuine issues of fact for trial on plaintiff's *qui tam* and retaliatory discharge claims, and denied defendants' converted motion for summary judgment, but granted in part defendants' motion to compel arbitration. *See Mikes II,* 889 F.Supp. at 749.[1]

In December 1995, defendants filed an answer with affirmative defenses and counterclaims. Pursuant to Fed.R.Civ.P. 12(b)(6) and 12(f), plaintiff has moved to strike certain affirmative defenses and to dismiss counterclaims.[2] Defendants have moved for summary judgment dismissing plaintiff's MRI-related claims for lack of subject matter jurisdiction on the ground that the MRI-related claims are based upon the public disclosure of allegations or transactions in a civil hearing within the meaning of 31 U.S.C. § 3730(e)(4)(A).

## DISCUSSION

### I. Affirmative Defenses

Plaintiff has moved to strike the following affirmative defenses pursuant to Fed. R.Civ.P. 12(f):

*Sixth Affirmative Defense*

The United States has suffered no injury.

*Seventh Affirmative Defense*

The relator is not the original source of the information contained in the complaint and has no standing to sue defendants.

*Ninth Affirmative Defense*

A written copy of the First Amended Complaint and written disclosure of substantially all material, evidence and information the relator possesses was not served on the government.

*Tenth Affirmative Defense*

The First Amended Complaint was not filed *in camera.*

Am.Ans. ¶¶ 41–42, 44–45. Defendants have moved for summary judgment on the seventh, ninth and tenth affirmative defenses, dismissing plaintiff's complaint with respect to MRI-related claims.

■ The seventh affirmative defense challenges subject matter jurisdiction under section 3730(e)(4), and will therefore be addressed first. *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1157 (2d Cir.), *cert. denied,* 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993). All material factual allegations in the *qui tam* complaint must be accepted as true when considering defendants' motion to dismiss for lack of subject matter jurisdiction. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992); *United States ex rel. Pentagen Technologies Int'l Ltd. v. CACI Int'l Inc.,* 1996 WL 11299, at *3 (S.D.N.Y. Jan. 4, 1996).

### A. Subject Matter Jurisdiction

■ Under section 3730(e)(4)(A), no court may assume jurisdiction over an action under the FCA based upon public disclosure of allegations or transactions in a civil hearing unless the action is brought by the Attorney General or the person bringing the action is an original source of the information. 31

1. Since the filing of the instant motions, and pursuant to this court's opinion in *Mikes II,* 889 F.Supp. 746, plaintiff has filed a Second Amended Complaint, in which claims originally filed under 31 U.S.C. § 3730(h) and New York Labor Law § 740 for retaliatory discharge, and under New York Labor Law § 191 for unpaid wages for work that she performed after defendants terminated her employment agreement, were withdrawn. The amendment of the First Amended Complaint does not affect issues addressed in this opinion. All references to the complaint in this opinion are to the Second Amended Complaint unless otherwise noted.

2. Since the filing of the instant motions, defendants have filed an amended answer with affirmative defenses and counterclaims. The counterclaims and affirmative defenses in question are not affected by the amendment of the answer. All references to the answer in this opinion are to the Amended Answer unless otherwise noted.

U.S.C.A. § 3730(e)(4)(A) (West Supp.1996).[3] "Section 3730(e)(4) is intended to bar 'parasitic lawsuits' based upon publicly disclosed information in which would-be relators 'seek renumeration although they contributed nothing to the exposure of the fraud.'" *Kreindler,* 985 F.2d at 1157 (citing *United States ex rel. Doe v. John Doe Corp.,* 960 F.2d 318, 319 (2d Cir.1992)).

The 1986 amendments to the *qui tam* provisions of the FCA set up a two-part test for determining jurisdiction.[4] First, the reviewing court must ascertain whether the "allegations or transactions" upon which the suit is based were "public[ly] disclos[ed]" in a "criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media." 31 U.S.C.A. § 3730(e)(4)(A) (West Supp. 1996). If the answer to the first question is negative, section 3730(e)(4)(A) does not bar jurisdiction, and the court need not proceed to the second step of the jurisdictional analysis. If—and only if—the answer to the first question is affirmative, *United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 651 (D.C.Cir.1994) (citing *Wang v. FMC Corp.,* 975 F.2d 1412, 1416 (9th Cir.1992)), will the court then proceed to the "original source" inquiry, under which it asks whether the *qui tam* plaintiff "has direct and independent knowledge of the information on which the allegations are based." 31 U.S.C.A. § 3730(e)(4)(B) (West Supp.1996). Under these circumstances, if the *qui tam* plaintiff qualifies as an original source, the action may proceed; if she does not, the action if barred.

Defendants argue that the information upon which plaintiff's claims regarding MRI testing are based was contained in the pleadings and motions filed with the New York State Supreme Court, Westchester County, in 1991 in *J & M Enterprises v. Tri–County Mobile MRI,* No. 91–6485 (N.Y.Sup. Ct. filed Dec. 18, 1990) [hereinafter the "J & M Litigation"]. In the J & M Litigation, J & M Enterprises ("J & M"), a limited partnership of which Straus (defendant in the instant action) is a general partner, alleged that Tri–County Mobile MRI ("Tri–County"), a limited partnership operating a mobile MRI facility in Westchester County, breached a contract (the "Agreement") under which Tri–County was to pay J & M for consulting services.[5] Tri–County asserted that the Agreement called for payments for MRI referrals and was therefore illegal. *See* Kilgannon Aff., Ex. D, at *14. In an affidavit in connection with the J & M Litigation, Straus stated as follows:

> [D]efendants are asserting that the contract at issue is "illegal" and was "a subterfuge to compensate me for the referral of patients" to defendant Tri–County Mobile.... In reality, quite the reverse is what is occurring. Defendants have breached the consulting agreement and failed to make payments thereunder to plaintiff because I have *not* referred patients to Tri–County ...

> The idea for a mobile MRI for Westchester County was conceived by me. A mutual friend introduced me to William

---

**3.** Section 3730(e)(4) reads in full as follows:
(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
(B) For the purpose of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C.A. § 3730(e)(4) (West Supp.1996).

**4.** For a thorough discussion of the 1986 amendments with respect to the *qui tam* provisions of the FCA, see *United States ex rel. Doe v. John Doe Corp.,* 960 F.2d 318, 321–22 (2d Cir.1992); *United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 649–51 (D.C.Cir.1994); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1154 (3d Cir.1991).

**5.** Details of the J & M Litigation are attached in Burke Aff., Ex. D and Kilgannon Aff., Ex. D. Citations to *[] represent the []th page in Kilgannon Aff., Ex. D, counting sequentially from the first page of that exhibit.

Ruffa, Esq. (defendants' counsel herein) who is knowledgeable about MRIs, as well as limited partnerships.

In turn, Ruffa introduced me and my partner to Al Woolf of Worchester, Massachusetts, who was potentially (and eventually became) a general partner. Many meetings were held among the partners of J & M, Ruffa, Woolf and a radiologist, who I also brought to the group. Most, if not all meetings were held in my home or office.

As a result of these meetings, Tri–County Mobile was formed.... To compensate me and my partner for initiating the deal, bringing the parties together, attending the many meetings to bring the business arrangement to a close and contributing to its structuring and commencement, the consulting agreement was entered into between J & M and Tri–County.

The first agreement proposed and drawn by Ruffa provided that J & M receive a percentage of the profits of Tri–County. I immediately rejected such a concept as it would have constituted fee-splitting. I insisted upon receiving compensation which was entirely unrelated to any patient referrals made by me or my partner to Tri–County. Ruffa was fully aware of this issue and it was agreed among all parties that the renumeration would be a fixed amount, i.e. $60,000 per year for twenty (20) years. In this manner, there would be no obligation for me or my partner to refer patients to Tri–County and no compensation correlated with either any referrals or even the success of the business....

[T]ri–County breached its contract with J & M as a direct result of our referring patients to other MRI facilities and our *not* sending patients to Tri–County.... Defendants have refused to honor their obligation under the contract and have attempted to coerce me into referring all patients to them with the threat (and action) of withholding payments to J & M if I refer patients elsewhere.

Kilgannon Aff., Ex. D, at *14–18 (emphasis in original).

Defendants argue that plaintiff in the instant action formulated her claims with respect to MRIs from information gleaned from the J & M Litigation court file and, in particular, from Straus's affidavit. According to defendants, plaintiff's MRI-related claims are based upon the allegation of MRI referral payments from Tri–County to J & M, which were publicly disclosed in the J & M Litigation, and is therefore barred for want of subject matter jurisdiction under section 3730(e)(4) of the FCA. We do not agree.

■ It is clear that a court's threshold inquiry, as dictated by section 3730(e)(4)(A), is whether the relator's *allegations* were publicly disclosed elsewhere and prior to the *qui tam* action—not just information concerning the allegations as defendants imply. "Courts sometimes speak loosely of barring a *qui tam* suit because it is based on 'publicly disclosed information.' [B]ut the Act bars suits based on publicly disclosed 'allegations or transactions,' not information." *Wang v. FMC Corp.,* 975 F.2d 1412, 1418 (9th Cir. 1992) (citing *United States ex rel. Dick v. Long Island Lighting Co.,* 912 F.2d 13, 17 (2d Cir.1990), and *Houck v. Folding Carton Admin. Committee,* 881 F.2d 494, 504 (7th Cir.1989), *cert. denied,* 494 U.S. 1026, 110 S.Ct. 1471, 108 L.Ed.2d 609 (1990)). Similarly, the court must ask whether the relator scooped its allegations from information in the public domain and that without such information the relator would never have thought of the allegations.

The information disclosed in the J & M Litigation cannot rise to the level of "allegations or transactions" so as to prevent the exercise of jurisdiction. Plaintiff's claims in the instant action do not allege fraud with respect to the receipt of MRI referral fees; rather, the claims allege fraud with respect to the submission of claims to Medicare for medically unnecessary MRIs. There was no allegation in the J & M Litigation that J & M knowingly caused false or fraudulent claims to be submitted through Medicare for medically unnecessary MRIs. Such an allegation, however, is the crux of plaintiff's MRI-related claims in the instant action. Plaintiff

stated in her affidavit dated June 5, 1992 as follows:

On or about September 23, 1991, I ... discovered that defendants were using magnetic resonance imaging ("MRI") more frequently and in lieu of less expensive x-rays and coaxial tomography ("CT" scans). Although MRI is an excellent diagnostic tool for the head, central nervous system, and bony joints, its use in thoracic diagnosis is limited[,] and MRI is not a recommended technique for post-cancer surgery follow-up or to screen for disease recurrence in the chest. (Reasons include respiratory and cardiac motion during testing which may significantly alter resolution and therefore precision of image formation.) The approximate cost of an MRI is $1,100.00 versus $350 for CT scan and $45 for an x-ray.

I learned that defendants' patients had their MRI studies done at various facilities in Westchester and Putnam County, all or most of which were serviced by a mobile MRI unit. It is common knowledge among Oxford Medical employees that the company owning and administering this mobile MRI was founded by Drs. Strauss and Ambinder in conjunction with a radiologist not affiliated with the Oxford Medical Group. When questioned regarding whether or not he continued in the company ownership, Dr. Strauss admitted in his usual oblique manner to having a "certain affection" for the success of the company.

As part of my evaluation of a given patient, I routinely review prior patient records. Through such reviews, I learned that Oxford Medical Group patients were receiving repeated scans of multiple body sites which in my opinion were excessive. The scans of the chest were of extremely limited diagnostic value, and those simple tests of great value, e.g. chest x-ray ("CXR"), were not performed. I presented defendants with current literature ... which enumerated the limitations of chest MRI. This information was received indifferently and seemed not to alter test request patterns.

Early months at the Oxford Medical Group provided me with many opportunities to observe the injudicious use of chest MRI by Drs. Straus, Ambinder, and Friedman. One vivid example involved a patient, Mrs. D., whom I saw in consultation in late September, 1991. Mrs. D. came to be a patient of Drs. Straus and Friedman after partial lung resection for lung cancer three or four years earlier. While under their care, Mrs. D. received intermittent courses of chemotherapy and was actively in the midst of a course of chemotherapy when I met her. Mrs. D was referred to me (by Dr. Friedman) for shortness of breath, cough, and dull pleuritic chest pain which had been intermittent over the prior years but became progressively worse in the months before our meeting. Review of her medical file (written by Drs. Straus and Friedman) revealed that *no* CXR or chest CT scan had been ordered during the time since Mrs. D.'s surgery years previous. (Standard care dictates periodic CXR screening with investigative chest CT scan if any change is detected by those serial CXRs. MRI is performed if CT scan is inconclusive or if certain defects [chest wall or brachial plexus invasion by tumor] are suspected by CT.) My review did reveal that chest MRI (as well as MRI of other body parts) had been performed every 3–6 months for at least two years; the last chest MRI performed was just one month before my consultation. Typed radiologist reports of the MRI studies were available and read "no change from prior study, no active disease."

I insisted that Mrs. D have a CXR performed and available for my review at the time of my evaluation. Her CXR showed post-operative changes as expected. Unexpected, however, was a large tumor mass at the old surgical site.

The mass seen on CXR in September, 1991, had no doubt been present and detectible for a very long time. Neither Mrs. D. nor her oncologist were aware simply because proper diagnostic tests had not been ordered; unhelpful and expensive testing had been performed instead.

Burke Aff., Ex. A. *See also* Second Am. Compl. ¶¶ 43–44 ("The defendants with knowledge that would reveal, or with grossly negligent or reckless disregard to facts and

conditions that would indicate, that MRI was inaccurate and unnecessary, caused to be performed said test upon patients, including, upon information and belief, individuals eligible for reimbursement through the Medicare program.... Upon information and belief, defendants presented, or cause to be filed, with the United States Government claims for said medical tests with knowledge of their falsity, or with grossly negligent or reckless disregard to facts and conditions that would indicate, that said tests were inaccurate or inappropriate and false and caused payments for said tests to be made by the United States Government upon those claims.").

Neither *John Doe,* 960 F.2d 318, nor *Kreindler,* 985 F.2d 1148, cited by defendants, controverts our holding. In *John Doe,* an attorney who had represented an employee of a government contractor in a criminal and civil investigation for fraudulent billing practices brought a *qui tam* action against the contractor under the FCA. The attorney learned of the fraud while representing his client who was being investigated in the defense contract scam. The court held that the relator's complaint was "based upon" allegations or transactions that were publicly disclosed in a manner provided in the statute:

> The allegations in [the relator's] complaint are the same as those that had been publicly disclosed prior to the filing of the *qui tam* suit. Public disclosure of the allegations divests district courts of jurisdiction over *qui tam* suits, regardless of where the relator obtained his information.... Were it otherwise, parasitic actions would flourish.

*John Doe,* 960 F.2d at 324.

In *Kreindler,* another attorney, who had represented the widow of a United States Army warrant officer in a wrongful death action against UTC, the manufacturer of a UH–60A ("Black Hawk") helicopter, brought a *qui tam* action under the FCA against UTC, contending that it knowingly violated its government contract and presented false or fraudulent claims for payment for over 700 Black Hawk helicopters delivered to the United States Army without a critical and contractually-required safety and performance feature. In connection with discovery in the underlying wrongful death suit, the attorney had entered into a stipulation and protective order which stated that all UTC documents provided in discovery were confidential and proprietary information which was to be used by the plaintiff solely for the purpose of the wrongful death action, and were to be immediately returned to UTC or destroyed upon the final termination of that action.

UTC argued that the court in the *qui tam* action lacked subject matter jurisdiction under section 3730(e)(4)(A) because discovery material containing all the information upon which the attorney's claim was based had been filed with the district court in the wrongful death action. The court agreed with UTC that this information was "publicly disclosed" because, although the relator was barred from disclosing that information by the stipulation, the record was not sealed. Furthermore, the court rejected the relator's argument that even if the discovery material was publicly disclosed, he did not obtain the pertinent information "solely" from that material, but also through independent investigation. The court repudiated the notion that section 3730(e)(4)(A) bars only actions based "solely" upon publicly disclosed allegations or transactions: "[T]he statute applies to a '*qui tam* action ... based in *any* part upon publicly disclosed allegations or transactions.'" *Id.* (emphasis added) (quoting *United States ex rel. Precision Co. v. Koch Indus., Inc.,* 971 F.2d 548, 553 (10th Cir.1992), *cert. denied,* 507 U.S. 951, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993)).

*John Doe* and *Kreindler* provide useful guidance with respect to the issue of what disclosure constitutes "public disclosure." However, those cases shed little light on the issue of whether information, which plaintiff concedes is publicly disclosed, amounts to allegations or transactions. In *John Doe* and *Kreindler,* it was undisputed that the relator was asserting the same allegations that were asserted in the underlying actions. According to the Second Circuit, allegations or transactions are "publicly disclosed" when they are "available to anyone who wishe[s] to consult the court file." *Kreindler,* 985 F.2d at 1158.

The instant case is readily distinguishable because plaintiff's complaint is not "based upon" allegations or transactions that were publicly disclosed in the J & M Litigation. The complaint and other papers filed in the J & M Litigation lack any allegation of false or fraudulent claims knowingly filed with the government. Therefore, it cannot be said that plaintiff's allegations had been publicly disclosed in the J & M Litigation prior to the filing of the instant *qui tam* action.

Finally, in *Gold v. Morrison–Knudsen Co.,* 68 F.3d 1475 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1836, 134 L.Ed.2d 939 (1996), also relied upon by defendants, a contractor brought a *qui tam* action under the FCA against various affiliated construction firms for cost overruns on three government housing construction projects. The United States Army Corps of Engineers had solicited bids for a family housing construction project at Fort Drum, in upstate New York. Gold, a contractor, submitted a $41 million bid; defendant submitted a $50.1 million bid. (There were no other bids.) The Army Corps disqualified Gold's bid for failure to comply with certain requirements, and defendant received the contract. Thereafter, various construction firms affiliated with defendant submitted winning bids totalling $570 million for two other Fort Drum projects. Gold did not submit bids for these two projects.

Defendants collected more than $100 million in extra payments for cost overruns under these three construction projects. The cost overruns were all part of the public record, having been addressed in extensive arbitration proceedings between defendant and the government, in draft administrative reports prepared by an Army Corps contracting engineer, who was monitoring progress under the contracts, and in articles in local papers and trade journals. Gold then brought a *qui tam* action under the FCA, pleading three "counts," one for each Fort Drum contract, alleging that defendants had defrauded the government.

On defendants' motion to dismiss for failure to plead fraud with particularity under Rule 9(b), the district court dismissed count one of the amended complaint, but ruled that counts two and three satisfied Rule 9(b). Thereafter, defendants moved for summary judgment on the two remaining counts, contending that the court lacked subject matter jurisdiction under the FCA, and the district court granted the motion.

The Second Circuit upheld dismissal of counts two and three for lack of subject matter jurisdiction:

> Gold gleaned the information underlying Counts Two and Three from the media, from administrative reports prepared for the Army Corps, and from arbitration hearings concerning the cost overruns. Because Gold had no direct and independent knowledge of any of this publicly disclosed information, he was not an original source of that information, and his suit is barred.

*Gold,* 68 F.3d at 1477. The *Gold* court relied on *Kreindler,* 985 F.2d at 1159, for the proposition that "FCA bars any claim where a third party is the core source of information underlying that claim" and *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1155–56 (3d Cir.1991), for the proposition that the "FCA precludes 'qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator.'" *Gold,* 68 F.3d at 1477–78. As articulated by the Third Circuit:

> One theme recurring through the legislative history in 1985 is the intent to encourage persons with first-hand knowledge of fraudulent misconduct to report fraud. Congress sought to stop the "conspiracy of silence" among employees of corporations engaging in fraud.... The Senate Report stresses that in order to detect fraud it was necessary to enlist the "cooperation of individuals who are either close observers or otherwise involved in the fraudulent activity."

*Stinson,* 944 F.2d at 1154. In contrast to plaintiff in *Gold,* plaintiff in the instant action is the quintessential whistle-blower whom the drafters of the *qui tam* provisions of the FCA, including the drafters of the 1986 amendments, seemed to have envisioned. Plaintiff is an insider who has first-hand

knowledge about allegedly unnecessary and wasteful ordering of MRI tests, at times instead of other tests actually needed by defendants' patients, which resulted in the filing of fraudulent Medicare claims.

■ As the case law makes clear, under section 3730(e)(4)(A), jurisdiction hinges upon the public disclosure of "allegations or transactions" occurring prior to a *qui tam* complaint, not the public disclosure of "information" relating to the allegations. It is the distinction between allegations and information that is crucial. *Pentagen*, 1996 WL 11299, at *5. We conclude that plaintiff's allegations were not publicly disclosed in the J & M Litigation or in any other manner prohibited by section 3730(e)(4)(A).

The Second Circuit's adoption of the Tenth Circuit's rule that section 3730(e)(4)(A)'s jurisdictional bar applies to a " '*qui tam* action ... based in *any* part on publicly disclosed allegations or transactions,' " *Kreindler*, 985 F.2d at 1158 (emphasis added) (quoting *Precision*, 971 F.2d at 553), is instructive. However, a careful comparison of the complaint suffices to show that the Court has subject matter jurisdiction of plaintiff's action because the complaint is not based in any part upon allegations or transactions publicly disclosed by the J & M Litigation.

Defendants seek, in the event that dismissal of the MRI-related claims is not granted, limited discovery on the issue of the court's subject matter jurisdiction over the MRI-related claims, including "discovery of all materials submitted to the U.S. Attorney by plaintiff; discovery of all statements of all witnesses made to the U.S. Attorney and/or plaintiff; discovery of Mikes affidavit dated April 12, 1992; discovery in the form of an examination before trial of Mikes regarding the basis for her MRI claims; and discovery in the form of an examination before trial of plaintiff's counsel regarding the substance, investigation and source of the MRI claims." Reply Memorandum of Law in Support of Defendants' Cross–Motion to Dismiss, at 13. We see no reason to delay the proceedings further in order to hold a hearing on whether this court has subject matter jurisdiction over the MRI-related claims. The key issue is whether the allegations or transactions

with respect to the MRI-related claims were publicly disclosed. The above discovery sought by defendants would reveal nothing relevant to that issue. The J & M Lawsuit was a breach of contract action in which defendant in that action asserted that the contract was not enforceable because it was an illegal contract for payment for referrals. Defendants have identified nothing in the J & M Lawsuit which could be interpreted as an allegation that defendants in the instant action committed fraud on the government by causing false or fraudulent Medicare claims to be submitted with respect to MRIs. Recognizing that the task of determining whether "allegations or transactions" have been "public[ly] disclos[ed]" will never be cut-and-dried, in this case we are nonetheless confident that the information put in the public domain by the J & M Litigation did not present so clear or substantial an indication of foul play as to qualify as either an allegation of fraud or a fraudulent transaction upon which a *qui tam* suit could be based. *Springfield Terminal Ry.*, 14 F.3d at 656.

## B. Section 3730(b)(2)

■ Defendants' ninth and tenth affirmative defenses attack plaintiff's MRI-related claims on procedural grounds. Defendants argue that plaintiff's MRI-related claims should be dismissed because (1) a written copy of the First Amended Complaint (in which plaintiff first asserted FCA claims with respect to MRIs) and written disclosure of substantially all material, evidence and information the relator possesses was not served on the government, and (2) the First Amended Complaint was not served on the Government *in camera*. Defendants rely on section 3730(b)(2) of the FCA, which provides as follows:

A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders.

The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

31 U.S.C.A. § 3730(b)(2) (West Supp.1996).

█ Defendants do not dispute that the original complaint was filed in accordance with section 3730(b)(2). However, defendants argue that the First Amended Complaint, where MRI-related claims are asserted for the first time in this action, was not served on the Government nor filed *in camera*. Given that the file may be unsealed after 60 days, during which time the Government may elect to intervene and proceed with the action, plaintiff argues that reading the statute as requiring service on the Government and *in camera* filing with respect to amendments to the complaint does not effectuate the intent of Congress in permitting the Government to review the matter in secret before intervening. We agree with plaintiff. The case law addressing a defendant's standing to challenge an FCA claim based on the procedural requirements of section 3730(b)(2) is sparse. The statute requires that plaintiff file her complaint and supporting information *in camera* with the Government so that the Government can investigate her claims and decide in secret whether or not to take over prosecution of the action.[6] The Government has been afforded this opportunity and has declined to proceed in the action. The Government continues to receive all pleadings filed in this case, and may, upon showing of good cause, intervene at a later date pursuant to section 3730(c)(3). Even assuming that plaintiff acted improperly by failing to formally serve on the Government, *in camera*, her MRI-related claims and supporting information, we believe that there has been no prejudice to the rights of the Government or the defendants which would warrant forfeiture of plaintiff's MRI-related claims. The notification provision at issue here is a mere procedural requirement of the exercise of the right created

by the statute, not a jurisdictional prerequisite. Particularly in a case such as this where the government has not been deprived of any rights, and has asserted no objection to plaintiff's failure to comply with section 3730(b)(2)'s procedural requirements, defendants should not stand to benefit. At least one Ninth Circuit panel has expressed the same view:

No provision of the False Claims Act explicitly authorizes dismissal as a sanction for disclosures in violation of the seal requirement.... [D]ismissal of [plaintiff's] complaint cannot be justified by reliance on the FCA.

By providing for the seal provision, Congress intended to strike a balance between "the purpose of *qui tam* actions [and] ... law enforcement needs[.]" S.Rep. No. 345, 99th Cong., 2d Sess. 24, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289. The purpose of *qui tam* actions is to encourage more private false claims litigation. *See id., reprinted in* 1986 U.S.C.C.A.N. at 5288. The other side of the balance recognizes the need

to allow the Government an adequate opportunity to fully evaluate the private enforcement suit and determine both if that suit involves matters the Government is already investigating and whether it is in the Government's interest to intervene and take over the civil action.

*Id., reprinted in* 1986 U.S.C.C.A.N. at 5289. The seal provision provides an appropriate balance between these two purposes by allowing the *qui tam* relator to start the judicial wheels in motion and protect his litigative rights, while allowing the government the opportunity to study and evaluate the relator's information for possible intervention in the *qui tam* action or in relation to an overlapping criminal investigation. *Id.*

When the seal provisions are violated, this balance cannot be disregarded. The requirements of § 3730(b)(2) are not juris-

**6.** The original complaint was filed *in camera* and served on the Government on April 16, 1992. The court so ordered several stipulations extending the time for the United States to intervene in this action to permit investigation of the relator's allegations before making a decision on whether

to intervene and proceed with the action. On April 19, 1993, the Government declined to take over prosecution of the action; the complaint was unsealed and served on defendants. Plaintiff then filed the First Amended Complaint on July 11, 1994.

dictional, and violation of those requirements does not *per se* require dismissal of the *qui tam* complaint. *See United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 1000 (2d Cir.1995) (expressing reluctance to rule that the requirements of § 3730(b)(2) are jurisdictional). Rather, the district court must keep in mind *both* sides of the balance when constructing a sanction for a violation of the seal provision....

First, the district court failed to consider whether the Government was actually harmed by [plaintiff's] disclosure. Courts that have previously addressed this issue and found dismissal appropriate have relied, at least in part, on the irreparable harm to the government caused by the complete failure to abide by any of the seal provisions, including failure to serve the government with a copy of the complaint. In *Pilon,* the court found that the violation "incurably frustrated the statutory purposes underlying [the seal] requirements[.]" *Id.* at 996. Similarly, in *Erickson ex rel. United States v. American Inst. of Bio. Sciences,* 716 F.Supp. 908 (E.D.Va. 1989), the court rested its holding on its finding that "Erickson's failure to comply with the filing and service provisions *irreversibly frustrates* the congressional goals underlying those provisions." *Id.* at 912 (emphasis added).

The mere possibility that the Government *might* have been harmed by disclosure is not alone enough reason to justify dismissal of the entire action. The district court should have assessed whether and to what extent the government was harmed before sanctioning [plaintiff] with dismissal.

*United States ex rel. Lujan v. Hughes Aircraft Co.,* 67 F.3d 242, 245 (9th Cir.1995). That court repudiated the notion that Congress enacted the seal provision to protect defendants from damaging attacks to which they are unable to respond:

The Committee's only documented concern regarding defendants' interests was that it avoid the pre-amendment possibility that defendants might be required to answer a complaint two days after service, without knowing whether its opponent would be the Government or a private litigant.... This was the only interest to which the Committee referred when it commented that "sealing the initial private civil false claims complaint protects both the Government and the defendant's interests without harming those of the private relator." ... [T]he Committee explicitly stated that "[b]y providing for sealed complaints, the Committee does not intend to affect defendants' rights in any way."

*Id.* at 247. Indeed, the Second Circuit also has adopted the view that the filing and service requirements of section 3730(b)(2) were meant primarily to protect the interests of the Government, and secondarily to protect defendants from having to prepare a defense without knowing whether the relator or the Government would be proceeding in the action:

The filing and service requirements were passed by Congress as part of substantial revisions to the False Claims Act in 1986. Legislative history reveals that the "overall intent in amending the *qui tam* section of the False Claims Act [was] to encourage more private enforcement suits." ... The government was concerned, however, that *qui tam* claims might overlap with or tip a defendant off to pending criminal investigations.... Thus, the sixty-day sealing period, in conjunction with the requirement that the government, but not the defendants, be served, was "intended to allow the Government an adequate opportunity to fully evaluate the private enforcement suit and determine both if that suit involves matters the Government is already investigating and whether it is in the Government's interest to intervene and take over the civil action." ... A secondary objective was to prevent defendants from having to answer complaints without knowing whether the government or relators would pursue the litigation.

*United States ex rel. Pilon v. Martin Marietta Corp.,* 60 F.3d 995, 998–99 (2d Cir. 1995). In the instant case, neither objective articulated by *Pilon* would be served by dismissing plaintiff's MRI-related claims. The Government was afforded the opportunity to

proceed in this action, but declined. Furthermore, pursuant to section 3730(c)(3), the Government continues to be served with copies of all pleadings filed in this action, and may, for good cause shown, intervene at a later date. Finally, defendants are not being required to litigate this action without knowing whether the relator or the Government is proceeding in the action.

## C. Injury

 Plaintiff's motion to dismiss defendants' affirmative defense that the United States has suffered no injury is denied. Plaintiff argues that "[s]ection 3729(a)(1) predicates liability upon the knowing presentation of a false claim. It is not necessary that the United States be 'out of pocket' or otherwise suffer monetary damages for liability to arise." Plaintiff's Memorandum of Law in Support of Motion to Dismiss Counterclaims and Certain Affirmative Defenses, at 6. Plaintiff's argument misses the point. Even if it is not necessary for plaintiff to demonstrate monetary damages, plaintiff must still prove that the United States has been injured by the filing with knowledge of a false or fraudulent claim. Because it cannot be disputed that plaintiff must allege and prove some injury-in-fact suffered by the United States, the affirmative defense is proper. *See Kreindler*, 985 F.2d at 1154 (In FCA *qui tam* action, "some injury-in-fact must be shown to satisfy constitutional requirements....").

## II. Counterclaims

Plaintiff argues that defendants' counterclaims fail to state a cause of action on which relief can be granted, Fed.R.Civ.P. 12(b)(6), because public policy bars their assertion against a *qui tam* relator. Defendants have counterclaimed that (1) "pursuant to 31 U.S.C. § 3730(d)(3) the relator is not entitled to share in the proceeds of this action, if any, for her role in planning and initiating a violation of 31 U.S.C. § 3729[;]" (2) "defendants are entitled to reasonable attorneys fees and expenses pursuant to 31 U.S.C. § 3730(g) and 28 U.S.C. § 2412(d) and common law principles[;]" (3) "the relator attempted to extort money from defendants by threatening to make life difficult for defendants if they refused to pay her a sum of money[;]" and (4) "[t]he relator's attempt to induce defendants to participate in a fraudulent scheme and to extort monies from defendants, and her exploitation of the federal law and judicial system to harm defendants in their business, warrants an award of punitive damages." Am.Ans. ¶¶ 77, 79, 81, 83.

## A. Contribution/Indemnification

 Defendants assert in the first counterclaim that "pursuant to 31 U.S.C. § 3730(d)(3) the relator is not entitled to share in the proceeds of this action, if any, for her role in planning and initiating a violation of 31 U.S.C. § 3729." Am.Ans. ¶ 77. Section 3730(d)(3) provides, in pertinent part, as follows:

> Whether or not the Government proceeds with the action, if the court finds that the action was brought by a person who planned and initiated the violation of section 3729 upon which the action was brought, then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive under paragraph (1) or (2) of this subsection, taking into account the role of that person in advancing the case to litigation and any relevant circumstances pertaining to the violation....

31 U.S.C.A. § 3730(d)(3) (West Supp.1996). This section confers no right upon defendants to assert a counterclaim against the relator for the relator's alleged participation in the submission of false claims in violation of the FCA. Nor can defendants rely on this section to reduce their liability for violation of the FCA. This section merely reduces the amount that may be awarded to the relator from the proceeds recovered by the government from the violator, and there is no provision for reducing defendants' liability. Any attempt by defendants to offset their FCA liability by seeking contribution or indemnification from the relator is futile. *See United States ex rel. Rodriquez v. Weekly Publications,* 74 F.Supp. 763 (S.D.N.Y.1947) (dismissing counterclaim for indemnification against *qui tam* relator under FCA); *Mortgages, Inc. v. United States Dist. Court for*

*the Dist. of Nev. (Las Vegas),* 934 F.2d 209 (9th Cir.1991) (holding that neither contribution nor indemnity is available in a *qui tam* action under the FCA, even if *qui tam* plaintiff participated in wrongdoing); *United States ex rel. Stephens v. Prabhu,* 1994 WL 761237 (D.Nev. Dec. 14, 1994) (dismissing third-party claims which sought indemnification and/or contribution from third-party defendants for any FCA liability proven against defendants at trial); *cf. United States ex rel. Madden v. General Dynamics Corp.,* 4 F.3d 827 (9th Cir.1993) (reversing dismissal of counterclaims seeking independent damages rather than indemnification and/or contribution against FCA relator); *Burch ex rel. United States v. Piqua Engineering, Inc.,* 145 F.R.D. 452 (S.D.Ohio 1992) (denying motion to dismiss compulsory counterclaims which sought damages independent of defendants' own liability under the FCA).

▮▮▮ Defendants' first counterclaim is not permitted to the extent that it seeks indemnification and/or contribution from the relator for FCA violations. To the extent that defendants seek to limit the relator's share of the recovery out of the total proceeds recovered from defendants, if any, defendants have no standing. *See United States ex rel. Taxpayers Against Fraud v. General Elec. Co.,* 41 F.3d 1032, 1045–46 (6th Cir.1994). Even assuming that the trier of fact ultimately finds that plaintiff planned and initiated the FCA violations, section 3730(d)(3) provides only that the relator's share of the proceeds of the action may be reduced; the Government, and not defendants, receives the amount reduced from plaintiff's share. "The FCA is in no way intended to ameliorate the liability of wrongdoers by providing defendants with a remedy against a qui tam plaintiff with 'unclean hands.'" *Mortgages,* 934 F.2d at 213.

**B. Fees and Costs**

▮▮▮ Plaintiff's motion to dismiss defendants' counterclaim for attorneys' fees and costs is granted. "[T]he court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." 31 U.S.C.A. § 3730(d)(4) (West Supp.1996). Furthermore, fees and costs may be awarded to a prevailing party under 28 U.S.C. § 2412(d), which is incorporated by reference pursuant to section 3730(g) of the FCA. However, defendants' counterclaim for fees and costs is procedurally improper because defendants have not yet prevailed. If and when defendants prevail in this action, the court will entertain defendants' application for fees and costs.

**C. Extortion**

Defendants allege that "the relator attempted to extort money from defendants by threatening to make life difficult for defendants if they refused to pay her a sum of money [and that] [t]his lawsuit is a vindictive act of extortion for defendants' refusal to be blackmailed and is causing defendants harm in their business." Am.Ans. ¶ 81. Plaintiff seeks dismissal of this counterclaim on grounds that (1) *Rodriquez* precludes counterclaims seeking to offset defendants' liability; (2) any claim arising during the period of employment must be arbitrated; and (3) the claim is premature.

▮▮▮ There is support in the case law for barring counterclaims seeking indemnification or contribution in a *qui tam* action. *See, e.g., Rodriquez,* 74 F.Supp. at 769 ("Fear of a counterclaim, based on the charge that the informer himself was solely involved and that the defendants relied upon his judgment and integrity, would in the average case discourage the institution of qui tam actions."); *Mortgages,* 934 F.2d at 213 ("Congress did not intend to create a right of action for contribution or indemnification under the FCA."). However, the modern trend does not support a ban on compulsory counterclaims which are based on damages which are "independent" of the *qui tam* claim. *See, e.g., Madden,* 4 F.3d 827 (permitting counterclaims for breach of duty of loyalty and fiduciary duty; breach of implied covenant of good faith and fair dealing; violations of state labor law; libel; trade libel; fraud; interference with economic relations; and misappropriation of trade secrets); *Burch,*

145 F.R.D. 452 (permitting counterclaims for breach of contract; breach of duty of loyalty; breach of fiduciary duty; breach of duty of fair representation; and defamation). Indeed, barring compulsory counterclaims based on damages that are independent of the *qui tam* action raises constitutional due process concerns. *See Burch*, 145 F.R.D. at 457 ("No provision of the FCA, or its legislative history, supports the proposition that a defendant may not raise a counterclaim. However, even if such a provision did exist, this Court would have grave concerns over its constitutionality, because its effect would be to deny a defendant the opportunity to have its compulsory counterclaim resolved in a judicial forum.").[7] We have some doubts concerning defendants' contention that their counterclaim for extortion is compulsory under the Federal Rules. *See* Fed.R.Civ.P. 13(a) (A compulsory counterclaim "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."). However, because defendants' counterclaim for extortion seeks "independent damages" rather than indemnification or contribution, the counterclaim is not barred by *Rodriquez*.

*Madden* distinguished counterclaims for indemnification or contribution from counterclaims for "independent damages." "Counterclaims for indemnification or contribution by definition only have the effect of offsetting liability. Counterclaims for independent damages are distinguishable, however, because they are not dependent on a qui tam defendant's liability." *Madden*, 4 F.3d at 830–31. That court applied the following compromise:

> [I]t is possible to resolve the issue of a qui tam defendant's liability before reaching the qui tam defendant's counterclaims.... If a qui tam defendant is found liable, the counterclaims can then be dismissed on the ground that they will have the effect of providing for indemnification or contribu-

tion. On the other hand, if a qui tam defendant is found not liable, the counterclaim can be addressed on the merits.

*Madden*, 4 F.3d at 831.

We are persuaded by the reasoning applied in other cases that have sought to compromise the interest in encouraging *qui tam* actions by protecting relators from counterclaims seeking actual or effective indemnification or contribution and the interest in protecting a defendant's constitutional right to assert compulsory counterclaims. These cases have permitted compulsory counterclaims that are based on independent damages to be asserted in a trial separate from the *qui tam* action. *See Stephens*, 1994 WL 761237; *Burch*, 145 F.R.D. 452; *cf. Madden*, 4 F.3d 827. We likewise separate defendants' counterclaim for extortion to be tried separately from the *qui tam* action. Fed. R.Civ.P. 42(b). Plaintiffs should not be permitted to insulate themselves from liability by asserting a *qui tam* action under the FCA. We express no opinion as to whether defendants' counterclaim for extortion can be sustained as pleaded nor as to the merits of the counterclaim.

▮ Plaintiff argues that the employment agreement between plaintiff and defendants bars the litigation of any claim arising during the period of employment. Plaintiff's vague reference to this court's previous decision sheds little light on this argument. In our previous decision, we held that plaintiff's retaliatory discharge claim involves issues surrounding the employment requirements contained in plaintiff's employment agreement. *Mikes II*, 889 F.Supp. at 755. Because the parties agreed to arbitrate all "disagreements, claims, questions or controversies which may arise out of or relate to [the] Agreement," we held that plaintiff's retaliatory discharge claim was subject to arbitration. *Id.* However, we distinguished plaintiff's *qui tam* claims:

---

7. As a compromise, the *Burch* court ordered a separate trial for defendant's counterclaim pursuant to Fed.R.Civ.P. 42(b).

> By ordering separate trials for the Plaintiffs' claim and the Defendant's counterclaims, this Court has attempted: (1) to advance the Congressional policy of encouraging qui tam ac-

tions in order to discourage fraud by defense contractors; and, (2) to protect the Defendant's constitutional right to procedural due process.

*Burch ex rel. United States v. Piqua Engineering, Inc.*, 145 F.R.D. 452, 457 (S.D.Ohio 1992).

**264**

Because plaintiff's *qui tam* action is completely outside the scope of the Agreement, it is not covered by the arbitration clause. The Agreement relates solely to the terms of plaintiff's employment by PCCA. However, plaintiff's *qui tam* claims in no way impinge on her employee status. Even if plaintiff had never been employed by defendants, assuming other conditions were met, she would still be able to bring a suit against them for presenting false claims to the government.... [P]laintiff's *qui tam* action clearly does not fall within her agreement to arbitrate.

*Mikes II,* 889 F.Supp. at 754–55. Likewise, defendants' counterclaim for extortion is completely outside the scope of the Agreement, and therefore is not covered by the arbitration clause. Furthermore, even if plaintiff had never been employed by defendants, assuming other conditions were met, defendants still could have asserted a counterclaim for extortion in their answer to plaintiff's *qui tam* action under the FCA.

**D. Punitive Damages**

 Defendants seek punitive damages on the ground that "[t]he relator's attempt to induce defendants to participate in a fraudulent scheme and to extort monies from defendants, and her exploitation of the federal law and judicial system to harm defendants in their business, warrants an award of punitive damages." Am.Ans. ¶ 83. Plaintiff argues that this counterclaim also arises during the employment period and therefore must be arbitrated in accordance with this court's previous decision. In addition, plaintiff argues that the fourth counterclaim essentially seeks recovery for vexatious litigation and therefore cannot be raised until the litigation is concluded in defendants' favor.

While we do not concur with plaintiff's analysis, we dismiss this counterclaim for public policy reasons. Allowing such claim might chill would-be relators from bringing claims under the FCA. We are mindful of the need to avoid allowing plaintiffs to insulate themselves from counterclaims by asserting frivolous FCA claims. However, concerns about abuses are partially allayed by the fact that the FCA provides for the defendants' recovery of all reasonably attorneys'

fees if the *qui tam* plaintiff's claim is "clearly frivolous, clearly vexatious, or brought primarily for purpose of harassment." 31 U.S.C.A. § 3730(d)(4) (West Supp.1996).

*CONCLUSION*

For the foregoing reasons, plaintiff's motion to dismiss counterclaims and to strike affirmative defenses is denied with respect to the sixth affirmative defense; granted with respect to the seventh, ninth and tenth affirmative defenses; granted with respect to the first, second and fourth counterclaims; and denied with respect to the third counterclaim. Defendants' cross-motion for summary judgment dismissing MRI-related claims is denied. Defendants' third counterclaim for extortion will be tried separately following the trial of plaintiff's claims.

SO ORDERED.