BRISCOE, Circuit Judge,
dissenting:
I respectfully dissent. I would reverse the district court and remand for further *1259 proceedings. I agree with the majority that the district court erred in concluding the existence of an ongoing government investigation operates as a per se bar to a qui tam suit, and that the government’s investigation in this case did not result in a “public disclosure” within the meaning of 31 U.S.C. § 3730(e)(4)(A). However, I disagree with the majority’s conclusion that Holmes is precluded from pursuing this lawsuit. More specifically, I disagree with the majority’s interpretation of the general qui tam provision of the False Claims Act (FCA), 31 U.S.C. § 3730(b)(1), as prohibiting a “federal employee who is part of an ongoing government investigation” from proceeding with a qui tam suit. Maj. Op. at 1251.
I.
“The FCA sets out civil and criminal penalties for persons who knowingly submit false claims to the government.” United States ex. rel. Dunleavy v. County of Delaware, 123 F.3d 734, 738 (3d Cir.1997); see also Avco Corp. v. United States Dept. of Justice, 884 F.2d 621, 622 (D.C.Cir.1989) (FCA “is the government’s primary litigative tool for the recovery of losses sustained as the result of fraud against the government.”). “A private person with knowledge of fraud against the government, acting as a de facto ‘attorney general,’ can instigate litigation on the government’s behalf against the parties responsible. Such suits are known as qui tam actions.” Dunleavy, 123 F.3d at 738. The FCA provides a built-in incentive for such plaintiffs, who are known as relators, to bring suit. Id. Specifically, the FCA provides that the relator shall, depending upon the circumstances of the- case, receive between 10 and 30 percent of the proceeds of the action, plus reasonable expenses, fees, and costs. 31 U.S.C. § 3730(d)(1), (2).
'Precisely who can qualify as- a relator under the FCA’s qui tam provisions has varied over the years, due in part to shifts in judicial interpretations generating, and sometimes generated by, statutory amendments to the qui tam provisions. As originally enacted in 1863, the FCA “contained broad qui tam provisions that permitted any person to prosecute a claim on behalf of the government and receive half of the amount recovered.” United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1162 (3d Cir.1991) (dissenting opinion). In 1943, the Supreme Court interpreted these provisions in United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443- (1943), and held that an individual could maintain a qui tam action under the FCA based solely on information copied from a government criminal indictment. Rejecting the government’s argument that a broad reading of the qui tam provisions “might bring unseemly races for the opportunity of profiting from the government’s investigations,” the Court held that -the plain language of the qui tam provisions allowed for a suit based solely on public information, and noted that Congress was the proper body to change or eliminate the FCA’s qui tam provisions. Id. at 547, 63 S.Ct. 379.
Congress responded immediately to the ‘ decision in Marcus, amending the FCA’s qui tam provisions to prohibit qui tam suits that were “ ‘based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought.’” See Stinson, 944 F.2d at 1163 (quoting 31 U.S.C. § 232(C) (1982) (superseded)). This new language, however, created problems of its own. “For example, in United States ex rel. Wisconsin v. Dean, 729 F.2d 1100 (7th Cir.1984), a state government was not allowed to maintain a qui tam action based on information it had gathered in its own investigations, because the state had supplied the government *1260 with the information prior to instituting its action.” Id. In 1984, “the National Association of Attorneys General strongly urged Congress to rectify the problem encountered in Dean.” Id. Congress subsequently amended the FCA in 1986 “to permit qui tam suits based on information in the Government’s possession, except where the suit was based on information that had been publicly disclosed and was not brought by an original source of the information.” Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 946, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (citing 31 U.S.C. § 3730(e)(4)(A)). The relevant text of the amendments provides:
(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
(B) For purposes of this paragraph, “original source” means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.
31 U.S.C. § 3730(e)(4)(A), (B). In sum, the amendments reflect Congress’ attempt to find “the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own.” United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 649 (D.C.Cir.1994).
We have held that “[satisfaction of the provisions of 31 U.S.C. § 3730(e)(4) is a question of subject matter jurisdiction.” United States ex rel. Fine v. Advanced Sciences, Inc., 99 F.3d 1000, 1003 (10th Cir.1996). Generally speaking, the jurisdictional inquiry under § 3730(e)(4) involves four questions: (1) whether the alleged “public disclosure” contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made “public” within the meaning of the False Claims Act; (3) whether the relator’s complaint is “based upon” this “public disclosure”; and, if so, (4) whether the relator qualifies as an “original source” under section 3730(e)(4)(B). Id. at 1004. If the answer to any of the first three questions is “no,” the jurisdictional inquiry ends and the qui tam action proceeds, regardless of whether the relator is an original source. The last inquiry, whether the relator is an original source, is necessary only if the answers to each of the first three questions is “yes,” indicating the relator’s complaint is based upon a specified public disclosure. See United States ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 552 & n. 2 (10th Cir.1992).
II.
In concluding that it lacked subject matter jurisdiction over Holmes’ qui tam claims, the district court acknowledged, but did not ultimately apply, the four-part inquiry outlined above. According to the district court, the four-part inquiry is applicable only “where the government is not actively investigating the alleged wrongdoing.” App. at 125. The court concluded that the purpose of the four-part inquiry under such circumstances is to determine “whether the government is ‘capable’ of pursuing the suit itself.” Id. In situations where the “government is actively pursuing the alleged wrongdoing when the qui *1261 tam action is sought,” the four-part inquiry is unnecessary “because it is clear that the government has already identified the problem.” Id. (internal quotation and citation omitted). Applying this analytical framework, the court concluded that it lacked subject matter jurisdiction over Holmes’ qui tam claims:
In this case, it is undisputed that, prior to the filing of the qui tam complaint by Holmes, the OIG [Office of Inspector General] and PIS [Postal Inspection Service] were involved in an active administrative investigation of the matters at issue in this suit and had identified the probable offenders. When the investigation substantiated fraud by CIG, Holmes was publicly commended and received a $500 bonus from her employer for her service. In July of 1998, prior to the filing of Holmes’ Complaint, the matter was referred to the Attorney General’s office and accepted for civil action. Between 1998 and the time the Complaint was filed, the Attorney General’s office continued to build a case against CIG. Because the PIS and OIG investigation and their subsequent referral of the matter to the Attorney General set the government “squarely on the trail of the alleged fraud,” Advanced Sciences, 99 F.3d at 1004, it would therefore “be contrary to the purposes of the FCA to exercise jurisdiction over [the relator’s] claim.” Id. Because my fundamental task in interpreting the FCA is “to give effect to the intent of Congress,” American Trucking Ass’ns, 310 U.S. at 542, 60 S.Ct. 1059, I must grant the United States’ Motion to Dismiss Holmes. It makes no difference that Holmes, as part of her role as postmaster, initially alerted the PIS and OIG to the alleged wrongdoing and spurred them to investigate.
Id. at 126.
The district court’s analysis is clearly flawed. Contrary to its conclusions, applicability of the four-part jurisdictional inquiry set forth in § 3730(e)(4) does not hinge upon whether the government is actively involved in an investigation of the alleged fraud. Rather, the four-part jurisdictional inquiry is applicable in all cases filed by qui tam relators and, as outlined above, subject matter jurisdiction hinges upon the outcome of the four-part inquiry. Although the presence or absence of an ongoing government investigation is relevant in applying the four-part inquiry, it is clearly not the determinative factor. Under the district court’s analytical framework, a prospective relator would have to report his or her information to the government and then immediately file suit in an attempt to act before the government instituted an investigation into the allegations. Further, the district court’s analytical framework is contrary to Congressional intent in that it could end up preventing persons with legitimate, inside knowledge of wrongdoing from pursuing a qui tam action.
III.
Obviously recognizing the deficiencies in the district court’s analysis, the government asks us to affirm the district court’s judgment on one of two alternate grounds. First, the government suggests that Holmes cannot qualify as a relator because the government investigation resulted in a “public disclosure” and Holmes does not qualify as an “original source.” Second, the government offers various public policy reasons why it would be inappropriate to allow Holmes to proceed as a relator in this action.

Public disclosure/original source

Focusing on parts two and four of the jurisdictional inquiry, the government argues that a “public disclosure” occurred when government investigators questioned the one current (Jim Benbrook) and two *1262 former (Cameron Benton and Henry Mo-drejewski) CIG employees,[1] and, in any event, Holmes does not qualify as an “original source” because she was obligated to report the alleged fraud (and thus did not “voluntarily” report it).
The term “public disclosure” is not defined in the FCA. In United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1519 (10th Cir.1996), we held that the term “signifies more than the mere theoretical or potential availability of information.” “[I]n order to be publicly disclosed, the allegations or transactions upon which a qui tam suit is based must have been made known to the public through some affirmative act of disclosure.” Id. Thus,
[t]he mere possession by a person or an entity of information pertaining to fraud, obtained through an independent investigation and not disclosed to others, does not amount to “public disclosure.” Rather, public disclosure occurs only when the allegations or fraudulent transactions are affirmatively provided to others not previously informed thereof
Id. at 1521 (emphasis added).
Applying these principles to the ease at hand, it is clear that a public disclosure did not occur when, during the course of their administrative investigation, government investigators questioned Benbrook, Benton, and Modrejewski. It is uncontrovert-ed that these three individuals participated, to one degree or another, in the alleged fraudulent scheme and thus were “previously informed” of the fraudulent scheme prior to their respective interviews with government investigators.[2]
The government concedes “there is some support” in Ramseyer and its progeny for the notion that, in order for there to be a public disclosure, the recipient of the disclosed information must be a stranger to the fraud. Gov’t Br. at 22. Notwithstanding this concession, however, the government attempts to distinguish these cases by arguing that they “do not address the different situation where there have been no disclosures to strangers to the fraud, but the Government is fully aware of the allegations and is actively pursuing its own investigation.” Id. Although its argument is not exactly clear, it appears the government is effectively asking us to modify the “public disclosure” test if the government is aware of the allegations, actively pursuing an investigation into the allegations, and responsible for the disclosure(s).
Although it is unclear precisely how the government would modify the “public disclosure” test in such circumstances, it argues that, at a minimum, its “disclosures to the two former CIG employees [Benton *1263 and ModrejewsM] during its investigation [in this case] should trigger the public disclosure bar, even though it turned out that they were not strangers to the fraud.” Id. at 34. The government does not clearly explain, however, why the disclosure to these former employees should be deemed sufficient to constitute a “public disclosure.” Apparently, the government finds significant the fact that they no longer work for the defendant. However, the government offers no principled distinction between them and the one man (Benbrook) who still worked for the defendant, since all three men had prior knowledge of the alleged wrongdoing. Further, the government cites no case where a court has held that a disclosure to a person familiar with the fraud constitutes a “public disclosure” for purposes of § 3730(e)(4).
The government makes several other arguments in an effort to demonstrate why a “public disclosure” has occurred within the meaning of § 3730(e)(4). Citing United States ex. rel Doe v. John Doe Corp., 960 F.2d 318 (2d Cir.1992), the government suggests that “the Second Circuit has squarely held that disclosures made by the Government to employees of a defendant corporation during the course of a fraud investigation constitute public disclosures under section 3730(e)(4)(A).” Gov’t Br. at 21. A review of the John Doe decision, however, demonstrates that the Second Circuit’s holding is not as broad as described by the government. In concluding that a public disclosure had occurred within the meaning of § 3730(e)(4)(A), the Second Circuit focused not on the fact that the government had generally disclosed information to the defendant’s employees, but rather that the disclosures had been made to many employees who were innocent and knew nothing about the defendant’s wrongdoing:
Here, ... the allegations of fraud were not just potentially accessible to strangers, they were actually divulged to strangers to the fraud, namely the innocent employees of John Doe Corp. While the search warrant was being executed, the investigators spoke to numerous employees of John Doe Corp., some of whom knew of the fraud. But, more importantly, many of these individuals knew nothing about defendants’ ongoing scheme; they were strangers to the fraud. These people were neither targets of the investigation nor potential witnesses. The government may have hoped that these individuals were potential witnesses, but it is clear that they were not.
960 F.2d at 322-23.[3] Thus, contrary to the government’s assertions, the decision in John Doe supports the conclusion that no public disclosure occurred in this case when the government interviewed persons who were involved in, or had prior knowledge of, the alleged wrongdoing.[4]
*1264 One other aspect of John Doe requires mention. Throughout its “public disclosure” discussion, the government repeatedly cites John Doe for the proposition that the purpose of the “public disclosure” test “was ‘to prod the government into action, rather than allowing it to sit on, and possibly suppress, allegations of fraud when inaction might seem to be in the interest of the government.’ ” Gov’t Br. at 25 (quoting John Doe, 960 F.2d at 323). Although the quotation is accurate (as far as it goes), a careful review of the John Doe decision demonstrates that the government misconstrues what the court said. Importantly, the language quoted by the government does not refer to the “public disclosure” test implemented by the 1986 amendments, but rather to the 1986 amendments in general. See 960 F.2d at 323 (“One reason for the 1986 amendments was to prod the government into action.”). On that point, the Second Circuit was absolutely correct: “prodding” the government into action was obviously Congress’ impetus for jettisoning the pre-1986 “government knowledge” standard, under which qui tam actions were barred if the federal government already possessed information upon which a qui tam action was based. That does not mean, however, that the purpose of the “public disclosure” test was the same. Rather, a review of the amendments and the legislative history makes clear that the purpose of the “public disclosure” test was to help identify and prevent “parasitic” qui tam actions (which Congress, consistent with its 1943 amendments, continued to want to limit).[5]
The government suggests that if its position is not accepted by the court, it will be forced “to make disclosures of relevant allegations to ‘innocent’ third parties in order to satisfy the public disclosure bar- and ensure that opportunistic qui tam suits will be barred.” Gov’t Br. at 31. This argument is without merit. If there has been no public disclosure of information, then, per se, there can be no parasitic lawsuits. Stated differently, if a qui tam action is filed prior to any public disclosure, there is obviously a reasonable presumption that the information on which the relator’s suit is based was personally obtained by the relator.
The government complains that a rule requiring disclosure “to individuals with no prior knowledge of the fraud would necessitate a bizarre mini-trial concerning the state of mind of various witnesses.” Gov’t Br. at 31-32. Obviously, a court faced with a public disclosure question may have to make factual findings regarding when and to whom a disclosure occurred. Nothing in the FCA suggests this is inappropriate. In any event, nothing of the sort was required in this case where the government has conceded that the three witnesses at issue were all involved in, or at least had prior knowledge of, the alleged wrongdoing.
*1265 Finally, the government argues that the “stranger-to-the-fraud” test “is flawed on its own terms because not all ‘strangers’ have incentives to disseminate information about fraud, and some individuals who have prior knowledge of fraud may have compelling incentives not to further publicize it.” Id. at 33. Although the government is undoubtedly correct that there will always be exceptions to the rule (as far as a particular person’s willingness to disseminate information), the “stranger-to-the-fraud” rule is obviously based on generalities. Moreover, the government has not offered a convincing test that could adequately replace the “stranger-to-the-fraud” rule. In any event, we are bound by prior precedent and thus are not free to ignore the “stranger-to-the-fraud” concept.
Because no “public disclosure” occurred prior to the filing of Holmes’ qui tam action, it is unnecessary to determine whether Holmes was an “original source” of the information upon which her complaint was based. As previously discussed, where, as here, a public disclosure did not occur, the jurisdictional inquiry comes to an end and the qui tam action proceeds, regardless of whether the relator qualifies as an original source.

Public policy

In a fall-back argument, the government offers several public policy reasons why federal employees should not be allowed to maintain qui tam actions based upon information obtained during the course of their employment. According to the government, “[permitting Holmes to pursue a qui tam action on the facts here would be inconsistent with her specific duty as a United States Postmaster to report fraud and with numerous legal duties imposed on all federal employees.” Gov’t Br. at 43. For example, the government argues, permitting Holmes to proceed as a relator would be contrary to federal regulations prohibiting “the use of public office for private gain,” “the use of Government property or time for personal purposes,” “the use of ‘nonpublic Government information’ to further private interests,” and “the holding of any financial interests that may conflict with the impartial performance of Government duties.” Id. at 44-45. The government further argues that “there is no intent expressed in the [FCA] to permit qui tam suits by federal employees whose job it is to report fraud when they encounter it,” and in fact “the legislative history of the 1986 amendments to the FCA reveals an intent to ‘encourage more private enforcement suits,’ ... not to encourage suits by public employees seeking to capitalize on information learned during the course of their federal employment.” Id. at 45. Finally, the government argues that “permitting qui tam suits by federal employees who are already under an obligation to disclose fraud would, as a practical matter, create perverse incentives for Government employees.” Id. at 45-46.
Although the government’s arguments are not without merit, we must not lose sight of the fact that nothing in the FCA expressly precludes federal employees from filing qui tam suits. Prior to 1986, the FCA “precluded jurisdiction where the action was based upon information in the possession of the United States or any of its employees at the time of the suit.” United States ex rel. Burns v. A.D. Roe Co., 186 F.3d 717, 722 n. 5 (6th Cir.1999). Thus, “government employees were effectively prohibited from bringing claims under the qui tam provision.” Id. The 1986 amendments to the FCA, however, revised the qui tam provision to allow any “person” to bring such a suit. See id.; 31 U.S.C. § 3730(b). “It is not clear whether Congress intended by the amendments to allow government employees to bring suit,” Burns, 186 F.3d at 722 n. 5, since nothing in the amendments or the legislative history thereto addresses the issue. *1266 Indeed, it appears that Congress did not give any thought to the issue at the time it formulated and enacted the 1986 amendments. See Major David Wallace, Government Employees as Qui Tam Relators, 1996-AUG Army Law. 14, 22 (1996) (“The sponsors of the 1986 FCA amendments simply did not contemplate the issue of government employees using information they learned in the course of their duties as the basis of lawsuits in their own names.”); Patrick W. Hanifin, Qui Tam Suits by Federal Government Employees Based on Government Information, 20 Pub. Cont. L.J. 556, 570-71 (1991) (“The legislative history does not expressly resolve the question of whether Congress intended to permit federal source suits. This is an instance where determining what Congress thought about an issue is difficult because Congress never thought about the issue, or at least did not express itself clearly.”).
Post 1986 congressional activity suggests that Congress views the FCA as allowing federal employees to file qui tam actions. “In 1990, the Subcommittee on Administrative and Governmental Relations of the House Judiciary Committee held the first oversight hearings on the Act.” Virginia C. Theis, Government Employees as Qui Tam Plaintiffs: Subverting the Purposes of the False Claims Act, 28 Pub. Cont. L.J. 225, 238 (1999). During those hearings, “[t]he Justice Department, the Inspector General of the Department of Health and Human Services, and John R. Phillips, an attorney who participated in drafting the amendments ..., proposed limits on federal employees seeking to bring [FCA] actions.” Id. “In 1992, Congress introduced two bills intended, in part, to address the issue of government employee relators.” Wallace, supra, at 22. The first of the bills, H.R. 4568, “would have established limitations on government employees who file[d] qui tam suits based on information gained during the course of their employment.” Theis, supra, at 238-39. The second bill, S. 2785, proposed banning “all qui tam suits brought by government employees who base[d] their actions on information obtained during the course of their government employment.” Wallace, supra, at 23. Both bills had critics, and neither were ultimately passed into law.
Consistent with this history, “no court has accepted the argument that government employees per se can never be rela-tors in a qui tam action.” Burns, 186 F.3d at 722 n. 5. Although some judges from the Ninth Circuit have criticized the practice of allowing federal employees to bring qui tam actions, see United States ex rel. Fine v. Chevron, U.S.A., Inc., 72 F.3d 740, 747, 749 (9th Cir.1995) (Trott, J., and Hawkins, J., concurring), that court has, at least in one instance, allowed a federal employee to proceed as a relator in a qui tam action. See Hagood v. Sonoma Co. Water Agency, 81 F.3d 1465, 1476 (9th Cir.1996). Likewise, the First Circuit has held that § 3730(e)(4)(A) does not per se “prevent government employees from bringing qui tam actions based on information acquired during the course of their employment.” United States ex rel. LeBlanc v. Raytheon Co., 913 F.2d 17, 20 (1st Cir.1990).
In my view, the most persuasive discussion of the issue comes from the Eleventh Circuit’s decision in United States ex rel. Williams v. NEC Corp., 931 F.2d 1493 (11th Cir.1991). There, the relator was an attorney for the United States Air Force who, “[djuring the course of his employment with the government, ... became aware of bidrigging on the part of a corporation seeking telecommunications contracts with the United States.” Id. at 1494. The district court dismissed the suit on the grounds that the FCA contained a jurisdictional bar against suits brought by government employees based *1267 upon information acquired in the course of their employment. On appeal, the court initially determined that no public disclosure had occurred prior to the relator filing suit, and thus concluded that it was unnecessary for the relator to establish that he was an “original source” of the information on which his suit was based. Id. at 1499-1501. The court then rejected the government’s argument that “the comprehensive bar against qui tam suits by government employees in the 1943 version of the [FCA] was never repealed by the 1986 amendments.” Id. at 1501. In particular, the court concluded that “[t]he structure of the 1986 version of the Act and several basic canons of statutory interpretation make it clear that no such general prohibition any longer exists.” Id. at 1502. Finally, the court rejected various public policy arguments forwarded by the government “for finding that Congress intended to bar government employees from initiating qui tam suits based upon information acquired in the course of their government employment.” Id. at 1503. Specifically, the court held:
We recognize that the concerns articulated by the United States may be legitimate ones, and that the application of the False Claims Act since its 1986 amendment may have revealed difficulties in the administration of qui tam suits, particularly those brought by government employees. Notwithstanding this recognition, however, we are charged only with interpreting the statute before us and not with amending it to eliminate administrative difficulties. The limits upon the judicial prerogative in interpreting statutory language were well articulated by the Supreme Court when it cautioned:
Legislation introducing a new system is at best empirical, and not infrequently administration reveals gaps or inadequacies of one sort or another that may call for amendatory legislation. But it is no warrant for extending a statute that experience may disclose that it should have been made more comprehensive. The natural meaning of words cannot be displaced by reference to difficulties in administration. For the ultimate question is what has Congress commanded, when it has given no clue to its intentions except familiar English words and no hint by the draftsmen of the words that they meant to use them in any but an ordinary sense. The idea which is now sought to be read into the [Act] ... is not so complicated nor is English speech so poor that words were not easily available to express the idea or at least to suggest it.
Addison v. Holly Hill Fruit Prods., [322 U.S. 607, 617-18, 64 S.Ct. 1215, 88 L.Ed. 1488] (1944). Congress could have certainly indicated its desire to prevent government employees from filing qui tam suits based upon information acquired in the course of their government employment. The False Claims Act is devoid of any statutory language that indicates a jurisdictional bar against government employees as qui tam plaintiffs. We also note an absence of any clear indication that Congress intended such a bar to be implied in spite of the plain language of the statute. Therefore, we decline to judicially create an exception where none exists.
Id. at 1503-04 (internal footnotes and quotations omitted).
For these same reasons, I reject the government’s public policy arguments and decline to hold that government employees are per se precluded from filing qui tam actions based upon information obtained during the course of their employment. Although there may be sound public policy reasons for limiting government employees’ ability to file qui tam actions, that is Congress’ prerogative, not ours.
*1268 IV.
The majority, using the government’s public policy arguments as a stepping stone, seeks to accomplish what Congress itself has been unable to do since the 1986 amendments, i.e., limit the ability of government employees to file qui tam actions based upon information obtained during the course of their employment. More specifically, the majority effectively amends the FCA’s general qui tam provision by interpreting the word “person,” as used in 31 U.S.C. § 3730(b)(1),[6] to exclude any government employee who “is part of an ongoing government investigation of fraud allegations” from pursuing a qui tam suit “based on those allegations.” Maj. Op. at 1248. In my view, this is improper.
To begin with, the majority fails to offer any justification for adopting and applying its own unique interpretation of the word “person,” as used in § 3730(b)(1). Neither party has asked us to interpret this statute. Admittedly, the FCA does not specifically define the word “person.” However, that does not mean the word is ambiguous, at least with respect to the extent that it encompasses individuals. As the Supreme Court has noted, a statute is ambiguous if it is “capable of being understood in two or more possible senses or ways.” Chickasaw Nation v. United States, 534 U.S. 84, -, 122 S.Ct. 528, 533, 151 L.Ed.2d 474, - (2001) (internal quotation omitted). While it might reasonably be argued that the word “person” either includes or excludes certain entities, there can be no doubt that it encompasses all human beings, including government employees. See Black’s Law Dictionary 1142 (6th ed.1990) (defining “person” as “a human being (i.e. natural person),” but noting that “by statute [the] term may include labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers”). Stated differently, it cannot plausibly be argued that the word “person” is reasonably capable of being construed as excluding government employees in general, or specific government employees in particular. Thus, the interpretation ultimately adopted by the majority cannot be classified as a “normal” or “everyday” meaning of the word “person.” E.g., Smith v. United States, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (“When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.”).
The majority has not invoked § 3730(b)’s title, “Actions by private persons,” nor could it legitimately do so. As the Supreme Court has. pointed out, the title of a statutory provision “cannot limit the plain meaning of the text,” and instead can only be used “when [it] shed[s] light on some ambiguous word or phrase.” Pennsylvania Dept. of Corr. v. Yeskey, 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (internal quotation omitted). Even assuming the word “person” was ambiguous (which it is not), employment of § 3730(b)’s title could only lead to one of two conclusions: either that all government employees fall within the class of “persons” capable of filing suit under the qui tam provisions, or that all government employees fall outside of that class.[7] See Black’s Law Dictionary 1196 (indicating *1269 “private person” is a “[t]erm sometimes used to refer to persons other than those holding public office or in military services”). Adoption of the latter conclusion would render superfluous the specific exclusions adopted by Congress in 31 U.S.C. § 3730(e)(1) (prohibiting “former or present member[s] of the armed forces” from filing qui tam actions “against a member of the armed forces arising out of such person’s service in the armed forces”).
Nor can the majority’s interpretation rest upon the “scrivener’s error” doctrine. Under the doctrine of “scrivener’s error,” a court may “give an unusual (though not unheard-of) meaning to a word which, if given its normal meaning, would produce an absurd and arguably unconstitutional result.” United States v. X-Citement Video, Inc., 513 U.S. 64, 82, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (Scalia, J., dissenting). Although there may be valid public policy reasons why certain government employees should be precluded from availing themselves of the qui tam provisions of the FCA, it cannot be said that defining the word “person” as encompassing all individuals, including government employees, would produce an “absurd and arguably unconstitutional result.” Nor can it be said that the interpretation adopted by the majority was “genuinely intended [by Congress] but inadequately expressed.” Id. It appears that in enacting the 1986 amendments to the FCA, Congress simply did not consider the question of whether government employees should be allowed to use information obtained in the course of their employment as the basis for a qui tam action. Thus, by interpreting the word “person” as it does, the majority ends up “rewriting the statute rather than correcting a technical mistake.” Id.
The majority suggests the First Circuit adopted a somewhat similar interpretation in LeBlanc. A review of LeBlanc, however, demonstrates that the First Circuit’s holding was dramatically different than the majority’s in this case. Rather than interpreting the word “person,” as used in § 3730(b)(1), the First Circuit was asked to interpret the “public disclosure” language contained in § 3730(e)(4)(A) and the definition of “original source” contained in § 3730(e)(4)(B). 913 F.2d at 20. With respect to the “public disclosure” provision, the First Circuit concluded that it “bar[red] government employees, as well as private citizens, from bringing qui tam actions only if the information forming the basis of the action was acquired in the circumstances described in 31 U.S.C. § 3730(e)(4)(A).” Id. Notably, the First Circuit held that the provision “does not prevent government employees from bringing qui tam actions based on information acquired during the course of their employment but not as the result of a government hearing, investigation or audit or through the news media.”[8] Id. As for *1270 the “original source” provision, the First Circuit concluded that a government employee, whose job responsibilities included uncovering fraud, could not qualify as an “original source” if the information that formed the basis of his qui tam action was obtained in the course of fulfilling those job responsibilities. Id. In sum, the First Circuit’s holdings prohibit certain government employees from qualifying as “original sources,” and thereby acting as qui tam relators, where there has been a “public disclosure” as described in 31 U.S.C. § 3730(e)(4)(A).[9] That is a far cry from rewriting the general qui tam provision of § 3730(b)(1) to limit the class of “persons” who may bring suit.
In sum, the majority’s decision is contrary to the plain language of § 3730(b)(1) and ordinary rules of statutory interpretation. According to the majority, “a federal employee who participates in a government investigation pursuant to her job duties is not, at least while the investigation is ongoing, a ‘person’ entitled to bring a civil action under section 3730(b).” Maj. Op. at 1251. Although this might be an acceptable legislative choice, nothing in the FCA or the other sources cited by the majority (e.g., the federal regulation governing federal employees’ use of “nonpublic Government information”) mandates this exclusion. It is my view that “only Congress can correct ... oversights of the kind” arguably presented here. Director, Office of Workers’ Compensation Programs v. Newport News Shipbuilding & Dry Dock Co., 514 U.S. 122, 142, 115 S.Ct. 1278, 131 L.Ed.2d 160 (1995) (Ginsburg, J., concurring).
Nor am I persuaded that any of the additional rationale offered by the majority justify its decision. For example, the majority suggests, mistakenly in my view, that exercising jurisdiction in this case “would be contrary to the FCA’s purpose of preventing parasitic suits.” Maj. Op. at 1256. The paradigmatic “parasitic suit” occurs when a person, otherwise unfamiliar with the situation, learns about the alleged fraud from a public disclosure and then attempts to file suit and capitalize on that information. It is uncontroverted that Holmes had direct knowledge of the alleged fraud and was the person who “blew the whistle” by notifying government investigators. Although there may be public policy reasons for excluding her, as a government employee, from filing suit under the qui tam provisions, her suit is certainly not a “parasitic” one.
Notably, the exclusion carved out by the majority does not eliminate the possibility of what could accurately be classified as parasitic suits in the government setting, i.e., suits by government employees lacking first-hand knowledge of the alleged fraud. Suppose, for example, that after discovering the alleged fraud in this case, Holmes had told a colleague or subordinate about it, and that the colleague or subordinate filed a qui tam action based on the information supplied by Holmes. Because the colleague or subordinate presumably would not be “involved in” any ensuing investigation because of lack of personal knowledge about the fraud, he or she would not be precluded under the majority’s holding from filing suit.[10]
*1271 The majority also fails to clearly define when a government employee is, in its words, “involved in” a government investigation. Presumably, a government auditor or investigator would be deemed to be “involved in” any investigation in which he or she has a professional responsibility. What about, however, a person such as Holmes who is not employed as an auditor or investigator, but who nevertheless learns about alleged fraud and reports it to her supervisor or to government investigators? Although that person may have precipitated an investigation, is she “involved in” it, thereby precluding her from filing suit? Based upon the majority’s holding, the answer to this question appears to be “yes.” Doesn’t this, however, create a perverse incentive for a government employee to simply file suit under the FCA prior to disclosing the information to any superiors or government investigators?
The majority suggests that Holmes should be precluded from filing suit because “this is a case of fraud allegations that the government is capable of pursuing." Maj. Op. at 1256 (emphasis in original). Given the FCA’s disclosure requirements, the same can be said for literally any qui tam action. Under 31 U.S.C. § 3730(a)(2), a relator filing a qui tam action must serve on the government “[a] copy of the complaint and written disclosure of substantially all material evidence and information the person possesses.” The relator’s complaint then remains “under seal for at least 60 days” and is not served “on the defendant until the court so orders.” Id. After receiving the relator’s complaint and evidence, the government has 60 days within which to elect “to intervene and proceed with the action.” Id. If the government elects to proceed with the action, “it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action.” 31 U.S.C. § 3730(c)(1).
Finally, the majority suggests that “a federal employee who reports a private company’s fraud on the government does not have the same fear of reprisal that a company insider who acts as a whistle-blower may have.” Maj. Op. at 1256. Although that may well be true where, as here, there is no indication that government employees participated with private actors in the alleged fraud scheme, that is certainly not always the case. Indeed, the majority recognizes as much when it notes, in its concluding section, that there may be legitimate reasons for allowing a government employee to file a qui tam action when his or her supervisor is involved in the alleged fraud. The possibility of these differing scenarios reinforces why this is a matter for Congress, rather than this court, to decide.
I would reverse the decision of the district court and remand for further proceedings.

 Although it is uncontroverted that a number of postal employees were also interviewed during the course of the administrative investigation, the government makes no attempt to assert that these resulted in a “public disclosure” of the allegations at issue. Indeed, the government concedes that its "disclosures to former and current employees of CIG ... have always been the sole basis for application of the public disclosure bar in this case.” Govt. Br. at 37.

. Benbrook “transported many of the mailings at issue from CIG to the Howard post office” and "submitted false certifications to the Howard post office in order to qualify the CIG bulk mailings for the lower postage rates.” Pltf's Br. at 8. Benton had talked to Holmes about a bulk mailing in October 1995, and he was aware "that CIG’s bulk mailings did not qualify for the lower postage rates CIG was receiving from the Howard post office.” Id. at 9. Modrejewski "accompanied ... Benton during the visit to the Poncha Springs post office” in October 1995, and “knew that the rates for CIG’s bulk mailing quoted by [Holmes] ... were higher than the rates CIG was receiving from the Howard post office.” Id.

. An argument can be made that the majority decision in John Doe was wrong, and that questioning so-called "innocent” employees of a company suspected of wrongdoing does not constitute "public disclosure” for purposes of the FCA. It is unnecessary to decide the issue, however, in light of the fact that all three witnesses at issue in this case had prior knowledge of the fraud.

. The government makes a similar, overly broad characterization of this court’s decision in United States ex rel. Fine v. Advanced Sciences, Inc., 99 F.3d 1000 (10th Cir.1996). See Gov’t Br. at 21 ("Likewise, this Court has made clear that a disclosure of allegations to even a single person outside the Government will trigger the jurisdictional bar.”). Although it is true that the court in Advanced Sciences concluded that a "public disclosure” had occurred based upon the disclosure of information to a single individual, a key aspect of that conclusion was that the individual to whom the information was disclosed was "previously unconnected with the alleged fraud.” 99 F.3d at 1005.

. The government makes several arguments that are tied to its mischaracterization of the John Doe quotation. For example, the government argues that ''[i]n cases where there is no evidence that the Government is aware of fraud allegations prior to a qui tam filing, ... determining whether a disclosure of fraud allegations has been made to at least one individual 'not previously informed thereof' is a reasonable proxy for assessing whether the Government will be made aware of the allegations — and feel some pressure to act on them — even without the impetus of a qui tam suit.” Gov't Br. at 30. However, the point of the public disclosure requirement is not to determine whether there is an impetus for the government to take action' — the filing of the qui tam lawsuit takes care of that. Rather, the point of the public disclosure test is to determine whether the qui tam lawsuit is a parasitic one.
The government also repeatedly suggests that "the sole purpose of looking for a disclosure is to determine if the Government is already on the trail of the fraud.” Govt. Br. at 39. This is clearly incorrect.

. That provision provides, in pertinent part, that “[a] person may bring a civil action for a violation of [the False Claims Act] for the person and for the United States Government.”

. Although the majority disclaims any reliance on § 3730(b)'s title, it nevertheless suggests "it would be quite plausible to interpret” the title to distinguish between what the majority refers to as "insider actions” filed by government employees against other government employees, and "non-insider actions based on information obtained in the course of government employment.” Maj. Op. at *1269 1266 n. 7. In my view, this proposed distinction is implausible. In either scenario, the potential relator obtains the information in the course of his or her government employment. The only practical distinction between the two scenarios is the perpetrator of the fraud (i.e., another government employee vs. a non-government employee or entity). Precisely how the status of perpetrator of the fraud could affect the potential relator's status as a “private person” is not explained.

. Although the majority contends the First Circuit concluded “there had been no public disclosure” in that case, Maj. Op. at 1268 n. 9, that is not clear from the opinion. See 913 F.2d at 20 (discussing meaning of "public disclosure” provision but failing to specify whether a "public disclosure” had actually occurred in the case before it). Given the court's subsequent discussion of the “original source" provision, it is fair to presume the court concluded that a “public disclosure” had occurred, thus triggering the requirement that the relator qualify as an "original source.” See Id.

. Under the First Circuit's holdings, Holmes would not be excluded from pursuing her qui tam action because there has been no "public disclosure” as set forth in 31 U.S.C. § 3730(e)(4)(A).

. To the extent the majority claims this cannot occur, its holding would amount to a per se ban on qui tam actions by government employees during the pendency of a government investigation (a holding quite similar to the one adopted by the district court and allegedly rejected by the majority).